## ALLEN and PAXSON vs. J. CULVER.

A debtor paying money to a creditor to whom he owes several debts, may appropriate it to which he pleases.

In default of an appropriation by the debtor, the creditor has a right to make the application.

If both omit to do it, and the demands consist of a running account, the presumption is that the first items of the account were intended to be satisfied.

And where neither party makes the application, the law will appropriate the payments according to the justice and equity of the case.

Sureties for the debt are concluded by the same rules, as to the appropriation of payments, which apply to their principal.

Where a general payment is made, the creditor is allowed a reasonable time to make the application.

An entry by the creditor of a general payment to the credit of an account does not preclude him from afterwards applying it to another demand, provided such entry be not communicated to the debtor.

But if he inform the debtor of the entry, it is an appropriation of the payment to that account.

Accordingly, where the relation of landlord and tenant existed, the latter being bound to pay his rent quarterly, and there were other extensive dealings between the parties, and the landlord kept an account with the tenant, in which he charged the rent as it became due along with other accounts against the tenant, and credited the payments made by the latter, *and from time to time rendered these accounts*

Allen *v.* Culver.

*to the tenant ;* in an action of covenant for the rent against a surety of the ten-ant, *held* that the payments must be applied in satisfaction of the several items of the account including the rent, according to the priority of time in which they were charged in the account.

Where a lease contained a covenant that in case of damage to the buildings on the demised premises by fire rendering the same untenantable, the lessor would *repair,* HELD that the covenant ran with the land and bound the grantee of the reversion, and that he was bound to *rebuild* houses which were wholly *destroyed* by fire.

And where a lease of premises on which there were several buildings, contained, in addition to the covenant last mentioned, a provision that the rent should cease for such part of the buildings as should be rendered untenantable on account of injury by fire, while they should remain untenantable, and a part of the buildings were destroyed by fire, and the landlord neglected to rebuild : *held* that the covenants to pay rent and to repair were independent, and that the lessee was bound to pay a proportionate part of the rent on account of the buildings left uninjured, notwith-standing the default in rebuilding.

Examples of covenants which run with the land and bind the grantee of the rever-sion and the assignee of the lessee. *Per* JEWETT, J.

Where a lease of land embraces also personal *chattels, the lessee's covenant to* return or replace or pay for them at the end of the term does not pass to the gran-tee of the reversion.

Nor does it bind the assignee of the lessee. *Per* JEWETT, J.

Authorities to show when the assignee of a lessee is bound by the covenants in a lease though not named, and when, for the reason that he is named, and where he is not bound though named, cited and commented on, *Per* JEWETT, J.

Where a lease of land also embraced personal chattels, which it was declared should be a part of the premises demised, and should remain on the premises at the end of the term, or be replaced or paid for by the lessee, and the covenant to surrender the demised premises at the end of the term contained an exception of *damages by the elements,* and the chattels were destroyed by an accidental fire during the term ; *held* that the lessee was not bound to replace or pay for them, the last men-tioned covenant modifying the strict terms of the other.

The contract of a surety of the lessee, who by a separate covenant had guarantied the payment of the rent and the performance of the covenants, passes to the gran-tee of the reversion, who is entitled to sue such surety in his own name for a breach of his covenant.

MOTION to set aside the report of referees, and also in arrest of judgment. The action was covenant for the non-payment of rent and for the breach of covenants in the lease, brought by the grantees of the reversion against the defendant, who, by a separate instrument, became surety for the lessee. The decla-ration set out a lease dated February 17th, 1837, from Arthur Hirst and Ann his wife to William H. Culver, for certain prem-

ises described therein, situated in Brooklyn, with the buildings and fixtures thereon, known as the *Nassau Whiting Factory,* for the term of five years and one month from the first day of April ensuing, and ending May 1st, 1842, at an annual rent of $2751, payable quarterly. The lessee covenanted to pay the rent, and that " on the last day of the said term or other sooner determination of the estate hereby granted the said party of the second part, his executors, administrators or assigns, shall and will peaceably and quietly leave, surrender and yield up unto the said parties of the first part, their heirs or assigns, all and singular the said demised premises in as good order and condition as the same are now in, ordinary wear and tear and damage by the elements excepted."

The parties also covenanted that there should be an inventory taken of the tools about the premises, and of certain *chalk stones* at the factory, which were used in the business of manufacturing whiting, which, it was agreed, should be " considered as part of the premises hereby demised and to pass therewith, and that the same are to remain in the possession of the said party of the second part, his executors, administrators and assigns, during the term hereby demised ; and upon the expiration of the term of years hereby granted, the same to be and remain on the said demised premises, or replaced with others, or the same are to be paid for by the said party of the second part, his executors, administrators and assigns." The lease also contained the following clause, inserted after the covenant before mentioned : " And it is further mutually covenanted, promised and agreed, that in case of damage by fire to said buildings rendering the same or either of them untenantable, the same shall be repaired by the said parties of the first part ; and while the same shall so remain untenantable by reason of such fire, the rent shall cease for such part of the buildings as shall be so injured."

There was an inventory of the tools and chalk stones at the foot of the lease with the respective values annexed ; the tools being valued at $69, and the chalk stones at $3000.

The defendant's covenant was on the back of the lease :  it bore the same date, and recited that the lease was executed  ?

Allen *v.* Culver.

the lessors at the request of the defendant; in consideration of which and of one dollar, the defendant covenanted to " become surety for the punctual payment of the rent within reserved and faithful performance of the covenants within contained; and in case of default being made by the said William H. Culver, I promise and agree to and with the said Arthur Hirst, his heirs and assigns, owners of said demised premises within contained, to pay such sum or sums of money as will be sufficient to make up such deficiency in payment of rent, or default in performance of covenants, without requiring any notice of non-payment, or proof of demand being made."

After setting out the lease and covenant, the declaration stated that the lessors Hirst and wife afterwards, to wit, on the first day of June, 1837, being seized of the reversion, granted and conveyed the same, " subject to and with the benefit of the lease," to the plaintiffs in fee. Breaches were assigned in the several counts of the declaration—1st, for the non-payment of the rent for the whole term; 2d, for not yielding up the premises at the end of the term in the condition required by the lease, but, on the contrary, having damaged and injured the fixtures; and " certain goods and chattels of the plaintiffs then being in and upon and a part of the said demised premises," being carried away and wholly lost to the said plaintiffs; and also that the *tools and chalk stones did not remain* on the premises, and have not been replaced or paid for as provided in the lease.

The defendant pleaded several special pleas which resulted in issues of fact, the substance of which it is not necessary to state, further than that they were pertinent to raise the questions discussed on the trial and on the motion.

On the trial before the referees, which was commenced on the 14th day of November, 1843, the lease, the inventory of personal property, the defendant's covenant and the conveyance by the lessors to the plaintiffs were read in evidence to the effect stated in the declaration. It was proved that on the 11th day of March, 1839, a large portion of the buildings upon the demised premises, including the Nassau whiting factory, were consumed by fire, and that the tools and chalk stones were burned and

much injured. The plaintiffs then claimed to recover the rent
from the commencement of the term to the time of the fire, at
the rate mentioned in the lease, and a proportionate rent for the
part of the premises left uninjured by the fire to the end of the
term, and also for the tools and chalk stones; and gave evidence
shewing the relative value of the buildings consumed to those
left standing after the fire. They also gave evidence respecting
the state of repair in which the premises were left at the end
of the term, irrespective of the effects of the fire.    .

On the part of the defendant it was shewn that the plaintiffs
after the fire wholly neglected to rebuild, although requested by
the lessee to do so, and that they assumed to treat the term as
at an end and gave notice to the lessee and to the defendant to
that effect, and that they brought an ejectment to recover the
possession, which, however, was not tried. Evidence was also
given that the chalk stones were over-estimated in the inventory,
and that they were actually worth about $1000. It appeared,
however, that the lessee had entered into a separate covenant
with the plaintiffs to insure the moveables for $3050, and to assign
the policy to the plaintiffs. He could not effect a policy to. tha
amount, but he did insure this property for $1000, and the
plaintiffs had the benefit of the policy. It appeared that prior to
the fire William H. Culver, the lessee, carried on the business
of manufacturing *whiting* on the demised premises, and that
the plaintiffs were his factors, and in that character sold his
goods and supplied him with various articles required in his
business. Their dealings were extensive, and the plaintiffs were
accustomed prior to the fire to furnish him from time to time
with an account current, in which, at the end of each quarter,
they debited him with a quarter's rent of the demised premises.
These accounts were produced at the trial, and the amount of
the plaintiffs' charges, to the time of the fire, including $5,347,23
for the rent to that time, amounted to $19,744,37, while the
items placed to the credit of the defendant amounted to
$16,384,24. It was proved that the lessee, Culver, also kept an
account against the plaintiffs, which was produced and sworn to
by Culver's clerk, and amounted at the period of the. fire to

Allen *v.* Culver.

$20,656,20. After the fire the plaintiffs re-stated their account with the lessee, leaving out the items charged for rent, and rendered it anew as thus altered, with a separate statement of the rent claimed. The accounts in the plaintiffs' books with the lessee were continued to the end of the term, and at that time shewed a balance in favor of the lessee of $1872,69, excluding all charges for rent.

The referees reported in favor of the plaintiffs, for $11,156,52; and being required to state the items allowed, with their reasons for the allowance, they certified, (1) That they had allowed the rent according to the reservation in the lease from the commencement of the term to the time of the fire, holding that the charging of the rent in the account current did not under the circumstances amount to an application of the payments; (2) That the lessee was liable for a proportionate part of the rent after the fire to the end of the term, and that $1300 was a fair proportion ; (3) That the defendant was not entitled to be allowed damages for the plaintiffs' breach of the covenant to rebuild ; (4) That the defendant was to be charged with the personal property mentioned in the inventory attached to the lease, at $3069, the amount there specified, and to be credited with the avails of the insurance, which was proved to be $870,94. The residue of the sum reported was made up of interest on the several items allowed.

*D. Lord & R. H. Waller,* for the defendant, insisted on the following points: (1) The contract of the defendant, which was that of a surety, was not assignable so as to enable the plaintiffs to sustain a suit in their own names. That contract was a collateral one, and did not run with the land. The covenant respecting the tools and chalk stones was merely personal and could not pass to the assignee of the lessor. For these causes the judgment should be arrested. (2) The rent being charged in the plaintiffs' accounts against the lessee, was paid and extinguished by the items credited in those accounts, which were thereby appropriated to that object. (3) The lessee was not bound to replace or pay for the *chalk stones.* They were part

of the subject demised and were within the *exception* in the covenant to yield up possession at the end of the term.

*G. Wood & J. W. Gerard,* for the plaintiffs.

*By the Court,* JEWETT, J. It is not disputed, but that the plaintiffs as assignees of the lessor and grantees of the reversion are entitled as against W. H. Culver, the lessee, to recover the full amount of the unpaid rent reserved by the lease, to the time of the fire. The whole amount of rent then due exclusive of interest, if no part had been paid, was $5347. The referees reported this sum against the defendant, with interest, after the same became payable by the terms of the lease, amounting in the whole at the date of the report to $7516,83.

The defendant insists that the rent to the time of the fire has been paid, by an actual appropriation of payments by the plaintiffs to that object. This must depend upon the question whether the payments, or credits, which so far as this question is concerned are the same thing, were appropriated. (9 *Wheat.* 720, 738; 4 *Mason,* 335.) The general rule, in regard to the appropriation of payments, is that the party who pays money has a right to apply the payment as he sees fit. If there be several debts due from him, he can designate that one to which it shall be applied. If the party making the payment do not, at the same time, make any specific appropriation thereof, then the party to whom the payment is made, may apply it as he pleases. If neither party make any specific application of the payments to the discharge of any particular debt, the presumption is that the first items of a running account, or that the debts which are first in point of time, are to be thereby discharged. In all cases, if the parties themselves have omitted to make any specific appropriation of payments, the law will appropriate them according to the justice and equity of the case for the benefit of both parties. (*Pattison v. Hull,* 9 *Cowen,* 747; *Baker* v. *Stackpoole,* 9 *Cowen,* 420; *Seymour* v. *Van Slyck,* 8 *Wend.* 403, *affirmed on error,* 15 *Wend.* 19; *Goss* v. *Stinson,* 3 *Sumn. Rep.* 98; *U. S.* v. *Kirkpatrick,* 9 *Wheat.* 720.)

Allen *v.* Culver.

This general rule applies equally in favor of sureties and guarantors; and any appropriation made by the party, entitled at the time to make such appropriation, is binding upon all the parties. (*Devayers* v. *Noble,* 1 *Meriv.* 585; 1 *Story's Eq. Jur. 3d ed.* § 459, *a.* § 459, *g.* ; *Stone* v. *Seymour,* 15 *Wend.* 19.)

The creditor is not, however, bound to make an immediate decision as to the particular debts or accounts to which he will appropriate payments, where there are several debts or accounts, or where there is a running account; but he will be allowed a reasonable time to decide, to which account or debt he will place it. When once he has made his election, however, he is bound by it. Whether such application has been actually made, is mere matter of evidence, depending upon the circumstances of the particular case. It has been held that the entry of payments by the creditor upon one account does not preclude him from applying them subsequently, within a reasonable time, to any other account, to which he might originally have applied them, provided that such entry has not been communicated to the party making the payment. This is upon the ground that the creditor, making private entries in his books, which were not communicated to the other party, did not indicate a complete election so to appropriate the payments, but merely an idea of so appropriating them. (*Simpson* v. *Ingham,* 2 *Barn. & Cress.* 65.) In that case a bond had been given by country bankers to the several persons constituting the firm of a London banking house, conditioned for remitting money to provide for bills, and for the repayment of such sums as the London bankers might advance on account of persons constituting the firm of the country banking house, or any of them. B. Ingham, one of the obligors, against whose representatives the suit was brought on this bond, died September 14th, 1811; and at that time there was a large balance due to the London house, the plaintiffs in the suit. The business was however continued by his surviving partners, who incurred further liabilities to the house in London, and also made large remittances to it. The plaintiffs continued to enter these transactions in the same account which they had before kept with the country firm, but they did not

render these accounts, nor did the manner in which they were kept come to the. knowledge of the other party. On the 13th November, having taken legal advice, they separated the accounts, striking a balance at the time of the death of the defendant's testator, and crediting the subsequent remittances to the new account, and *then rendered both accounts to the debtors.* The question was whether the defendants were entitled to credit for the payments made subsequently to the death of their testator. It was held that the entries in the books of the London bankers did not amount to a complete appropriation by them of the several payments to the old account, such appropriation not being complete until it was communicated to the party to be affected by it; and that the London bankers, notwithstanding those entries, were entitled to apply the payments received subsequently to the death of the deceased partner to the debt of the new firm. Holroyd, J. said: "The persons paying the money not having made any direct application of it, the right of making such application devolved on the receivers; and if they have done no act which can be considered as such an application, it is equally clear, that although they did not apply it at the moment of payment, they would have a right to make the application at a subsequent period. The question therefore is, whether from any entry in the books there appears to have been a complete election by them to apply the payments in any other way than they are applied in the accounts which have been actually delivered. Now these entries not having been communicated to the opposite party, it seems to me that the election was not complete. The effect of making the entries in their own private books, shows only that the idea of so applying the payments had passed in their own minds. It is much the same thing as if they had expressed to a stranger their intention of making such application of the payments, and had afterwards refused to carry such intention into effect." "The entries made in the bankers' books could not amount to an election by them to appropriate the sum to a particular account, until those entries were communicated to the opposite party."

The evidence in this case shows that the premises were rent-

ed for the purpose of carrying on extensively the manufacture of whiting and other articles ; that the plaintiffs became the assignees and grantees of the lessors and entitled to the rent of the premises from the commencement of the term. They were also the factors of the lessee for the sale of his wares and the receipt of the proceeds, and purchased largely for him the raw materials necessary for the carrying on the business. They were, from the commencement of the business of Culver, almost in the daily receipt of merchandize and the proceeds on its sale by them, and of making advances to enable him to carry on his business, to the time of the fire and to some extent afterwards. They kept an account current with their principal of all their dealings, in which they charged him regularly the rent as it became payable, quarterly, until in the spring of 1839, after the fire occurred ; and they from time to time rendered these accounts to him. No objections from either party were at any time made during that period, and there was no demand for the payment of rent in any other way during that time ; and Culver was at all times up to the occurrence of the fire able to pay. Now it seems to me that this evidence clearly demonstrates, that the plaintiffs made a distinct application of the credits as payments, as well of the rent, as it accrued, to the time of the fire, as of their other debits, against Culver. Their accounts current rendered to Culver amount to an election by them to appropriate the credits to the payment of the rents which had become payable; and having made such election they are clearly bound by it. In the case of a running account between parties, when there are various items of debit on one side, and of credit on the other, occurring at different times, and no special appropriation of payments, constituting the credits, has been made by either party, the successive payments and credits are to be applied in discharge of the items of debit, antecedently due, in the order of time in which they stand in the account. In other words, each item of payment or credit is applied in extinguishment of the earliest items of debt, until it is exhausted. (*Clayton's case*, 1 *Meriv. R.* 572, 604, 608 ; *U. S.* v. *Kirkpatrick*, 9 *Wheat.* 720, 737.)

My conclusion is that the referees erred in allowing the plain-

tiffs the several quarters of rent debited the lessee in their several accounts current rendered, up to and including the time of the fire, in March, 1839. The plaintiffs were entitled to be allowed no greater sum on that account than remained, if any thing, after applying the credits to the discharge of the debts as made in their account according to the principles above stated.

The next question is, whether the plaintiffs are entitled to recover a proportional part of the rent for the period subsequent to the fire to the end of the term. But for the provision in the lease looking to the case of fire, the tenant would undoubtedly have been liable to pay the whole rent without any abatement in consequence of the destruction of a portion of the buildings. (*Gates* v. *Green*, 4 *Paige*, 355; *Hallett* v. *Wylie*, 3 *John.* 44; 3 *Kent's Com.* 465.) It is plain that the lessee is liable under the lease to pay a proportional part of the rent for the premises not destroyed by the fire. The evidence to show the proportion justly chargeable is in some respects conflicting; we cannot say that the conclusion of the referees upon it was erroneous.

There is no doubt but that by a covenant to repair, like the present, the lessors are bound to rebuild, in case of total destruction by fire; and that the lessee may have his action, to recover the damages sustained by reason of the non-performance of this covenant. It has been repeatedly adjudged, that on a general covenant by the lessee to repair, he is bound to rebuild, in case of an accidental fire by which the buildings are destroyed; and I see no principle by which the lessors under such a covenant can be excused. (*Bullock* v. *Dommitt*, 6 *T. R.* 650; 4 *Kent's Com.* 467.)

This covenant ran with the estate in the land, and for a breach of it the assignee of the lessor and the grantee of the reversion is clearly liable to answer in damages to the lessee or his assignee. (*Jourdian* v. *Wilson*, 4 *Barn. & Ald.* 266; *Spencer's case*, 5 *Coke*, 17; 1 *R. S.* 747, § 24.) This covenant is, however, independent of the covenant to pay rent, and the breach of it does not furnish any ground to resist the payment of rent for the residue of the premises; its performance is not a condition precedent to the payment of such rent.

Unless the covenant, in relation to the *tools* and *chalk stones*, is one which runs with the estate in the land, the action for the breach of it cannot be sustained in the name of the plaintiffs, but must be brought by the lessors in whom the legal interest in the contract is vested. (1 *Chitty's Pl.* 11, 12, *ed.* 1812; *Willard* v. *Tillman*, 2 *Hill*, 274.)

The following are instances of covenants running with the estate in land : 1. A covenant of warranty. (*Suydam* v. *Jones*, 10 *Wend.* 180; *Withy* v. *Mumford*, 5 *Cowen*, 137; *Le Ray De Chaumont* v. *Forsythe*, 2 *Penn. R.* 507; *Wyman* v. *Ballard*, 12 *Mass. R.* 306; *Mitchell* v. *Warner*, 5 *Conn.* 497.) 2. A covenant for quiet enjoyment. (*Markland* v. *Crump*, 1 *Dev. & Bat.* 94.) 3. A covenant that neither the grantor nor his heirs shall make any claim to the land conveyed. (*Fairbanks* v. *Williamson*, 7 *Greenl.* 96.) 4. A covenant by a tenant to repair. (*Demarest* v. *Willard*, 8 *Cowen*, 206; *Norman* v. *Wells*, 17 *Wend.* 148.) 5. A covenant to pay rent. 6. A covenant not to erect a building in a common or public square owned by the grantor, in front of the premises conveyed. (*Watertown* v. *Cowen*, 4 *Paige*, 510.)

Although the parties agreed that the tools and chalkstones mentioned in the covenant, should be considered as part of the premises demised, and should pass therewith, they are nevertheless mere personal chattels, out of which the rent could not issue. It is true, that the yearly value of the demised premises may have been increased by the letting of these articles of personal property ; still the rent reserved continues to issue out of the land alone. In *Spencer's case*, (5 *Co.* 17,) it is resolved, that "if a man lease sheep, or other stock of cattle, or any other personal goods, for any time, and the lessee covenants for him and his assigns at the end of the time to deliver the like cattle or goods, as good as the things letten were, or such price for them, and the lessee assigns the sheep over, this covenant shall not bind the assignee ; for it is but a personal contract ;" and it is added,--"The same law, if a man demises a house and land for years, with a stock or sum of money, rendering rent, and the lessee covenants for him, his executors, administrators and as-

signs, to deliver the stock or sum of money at the end of the term, yet the assignee shall not be charged with this covenant, for although the rent reserved was increased in respect of the stock or sum, yet the rent did not issue out of the stock or sum, but out of the land only, and therefore, as to the stock or sum, the covenant is personal and shall bind the covenantor, his executors and administrators who represent him, and not the assignee—and because it is not certain that the stock or sum will come to the hands of the assignee, for it may be wasted, or otherwise consumed or perished, through the lessee ; and therefore the law cannot determine, at the time of making the lease, that such covenant shall bind the assignee." See also *Newman* v. *Anderton*, (2 *New Rep.* 226.)

A covenant to lay out a given sum of money in rebuilding or repairing the premises in case of damage by fire, would clearly be a covenant running with the land, that is, such a covenant as would be binding on the assignee of the lessee, and which the assignee of the lessor might enforce ; for the reason, that the covenant in that case would respect the thing demised—to do a matter which concerns the land, and falls within the rule laid down in *Spencer's case*, and by Lord Chief Justice Wilmot in *Bally* v. *Wells*. ( *Wilmot's Notes*, 344.) He states the doctrine thus :—" Covenants in leases extending to a thing *in esse* parcel of the demise, run with the land, and bind the assignee, though he be not named, as to repair, &c., and if they relate to a thing not *in esse*, but yet the thing to be done is upon the land demised, as to build a new house or wall, the assignees, if named, are bound by the covenants ; but if they in no manner touch or concern the thing demised, as to build a house on other land, or to pay a collateral sum to the lessor, the assignee, though named, is not bound by such covenants ; or if the lease is of sheep or other personal goods, the assignee, though named, is not bound by any covenant concerning them." " The reason why the assignees, though named in the two last cases, are no. bound, are not the same. In the first case, it is because the thing covenanted to be done has not the least reference to the thing demised ; it is a substantive, independent agreement, not

*quodam modo* but *nullo modo,* annexed or appurtenant to the thing leased." " In the case of mere personalty, the covenant doth concern and touch the thing demised; for it is to restore it or the value at the end of the term; but it doth not bind the assignee, because there is no privity, as there is in the case of a realty between lessor and lessee and his assigns, in respect to the reversion; it is merely collateral in one case; in the other it is not collateral, but they are total strangers to one another, without any line or thread to unite and tie them together, and to constitute that privity which must subsist between debtor and creditor to support an action." And on page 346, after citing several cases, from which he deduces the principle laid down, he says: " All these cases clearly prove that inherent covenants, and such as tend to the support and maintenance of the thing demised, when assigns are expressly mentioned, follow the reversion and the lease, let them go where they will."

In *Vernon* v. *Smith,* (5 *Barn. & Ald.* 1,) Best, J. says: " By the terms collateral covenants, which do not pass to the assignee, are meant such as are beneficial to the lessor, without regard to his continuing the owner of the estate. This principle will reconcile all the cases." In *Vyvyan* v. *Arthur,* (1 *Barn. & Cress.* 410,) the same learned judge says: " The general principle is, that if the performance of the covenant be beneficial to the reversioner, in respect of the lessor's demand, and to no other person, his assignee may sue upon it; but if it be beneficial to the lessor, without regard to his continuing owner of the estate, it is a mere collateral covenant, upon which the assignee cannot sue." In *Bally* v. *Wells,* (3 *Wilson,* 25,) it is said, " There must always be a privity between the plaintiff and defendant, to make the defendant liable to an action of covenant. The covenant must respect the thing granted or demised. When the thing to be done, or omitted to be done, concerns the land or estate, that is the medium which creates the privity between the plaintiff and defendant; as if lessee for life, covenants for him, his executors and administrators, to build a wall within his term, and afterwards he assigns over his estate, the grantee of the reversion shall have covenant against the

assignees; and notwithstanding the covenant wants the word assigns, yet every assignee by accepting the possession, hath made himself subject to all covenants concerning the land, but not to collateral covenants; and covenants of repairs, and building walls or houses, are covenants inherent to the land, with which the assignee without special words shall be charged. Also when the lessor for years covenanted in his lease, that at the end of the term, he would make a new lease to the lessee or his assigns, and afterwards granted over his reversion, and at the end of the term the lessee brought covenant against the grantee of the reversion, it was agreed by all the justices and sergeants that the action did well lie."

I do not see that the case cited by the plaintiffs' counsel from the Year Book of 42 Ed. 3, is so much in point as was supposed by him, to sustain the proposition that this covenant run with the land. There the prior of a convent (a corporation having perpetual succession) made a covenant for him and his successors with the lord of a manor and his heirs to sing all the week in a chapel, parcel of the manor. It was held that the covenant run with the land and passed to the alienee of the manor; though it would have been otherwise if the covenant had been to say divine service in the chapel of another, for the covenant in such case cannot be annexed to the chapel, because the chapel does not belong to the covenantee. The thing to be done in the case of the prior, affected the land, increased its value to the extent of the value of the singing covenanted to be done. (*See Spencer's case, sup.*).

The statute (1 *R. S.* 747, §§ 23, 24,) does not make every covenant which may find a place in a lease assignable. The twenty-third section in terms provides that the grantees of any demised lands, tenements, rents, or other hereditaments, or of the reversion thereof, the assignees of the lessor of any demise, and the heirs and personal representatives of the lessor, grantee or assignee, shall have the same remedies by entry, action, distress or otherwise for the non-performance of any agreement contained in the lease so assigned, or for the recovery of any rent, or for the doing of any waste or other cause of forfeiture, as their

Allen v. Culver.

grantor or lessor had or might have had if such reversion had remained in such lessor or grantor. . This statute is but a re-enactment of 32 Hen. 8, ch. 34. Spencer's case shows that the English statute was confined to covenants touching or concerning the thing demised, and did not extend to collateral covenants. The construction contended for here would make all covenants negotiable, or which is the same thing, assignable, if the parties would but insert them in any indenture of demise, which would confound all distinction between covenants real and personal. I think the statute does no more than to transfer the privity of contract of a covenant real, between the lessor and lessee, and does not affect a strictly personal covenant, although it be contained in a lease. (*Norman* v. *Wells*, 17 *Wend.* 136; *Willard* v. *Tillman*, 2 *Hill*, 274.)

If the tools and chalk stones can properly be regarded as a portion of the demised premises, they having been injured or destroyed by fire, the lessee is not liable to replace them with articles of equal value, or to pay the value of them prior to the fire. The covenant to surrender and yield up the demised premises, at the expiration of the term, expressly excepts the consequences, not only of the ordinary wear and tear, but the "damages by the elements." The covenant that they were to remain in the possession of the lessee during the term, and at its expiration to remain on the premises or be replaced with others, or to be paid for by the lessee, does not qualify the covenant to surrender the demised premises, so as to subject the lessee to account for these articles in case they were damaged or destroyed by fire while in the position contemplated by the parties. This covenant, when taken in connection with the covenant to surrender at the end of the term, regarding the tools and chalk stones as part of the demised premises, amounts to nothing beyond imposing a liability on the lessee to replace or pay for them, in the event that they should be removed from the demised premises and not returned. Clearly if they had remained on the demised premises till the expiration of the term, however reduced in value by proper use, it would not be pretended that the lessee would be liable to replace, or pay what they were

worth when demised; and if not, I see no ground to say that the lessee was liable in the event of destruction or damage by fire. There is no covenant that the lessee was to keep and leave them at the expiration of the term on the premises in good repair, or equal in value, as when he received them. It is true, the value was estimated and put down in the inventory attached to the lease, but the covenant or agreement between the parties did not provide or call for any valuation—but merely an inventory—a list or schedule of the items of the property.

But if it be admitted that the lessee was bound to pay for this personal property, the referees erred in holding the defendant to the valuation attached to it in the inventory. The proof showed that it was greatly over estimated, and yet the referees allowed the whole amount of that valuation. The covenant to insure was in a separate instrument, which was not guarantied by the defendant, and an insurance was actually effected to as large an amount as it could be insured for, and the plaintiffs had the benefit of the policy and of the property as it remained after the fire. The separate contract for insurance was high evidence, if any were needed, that the parties did not understand the lease as binding the lessee to replace or pay for this property in the event of its injury by fire.

There is another reason why the plaintiffs cannot recover for the personal property. An examination of the conveyance of the reversion will show that neither the tools nor chalk stones passed to the plaintiffs by that deed. It describes the real estate mentioned in the lease; and the *habendum* clause declares it to be "subject to and with the benefit of" the lease. As I understand the terms of this conveyance it passed to the plaintiffs the grantors' title or estate in the land described, with the appurtenances and the rents reserved, and the covenants relating thereto, and not the tools or chalk stones. If this personal property had remained in the possession of the lessee to the end of the term, could it be maintained that the plaintiffs had acquired a title or right to it by virtue of their deed? It is plain to my mind that it could not. It is not embraced within the terms of the conveyance.

It is insisted that the defendant's covenant to guaranty the payment of the rent, was not assignable, so as to enable the plaintiffs to sue in their own names for a breach of that covenant. It is not necessary that the defendant should have taken an interest in the land. In the case cited from the Year Book 42 Edw. 3, the prior and his successors took no estate in the land, yet it was held, that the covenant to sing in the chapel went with the land. When the thing to be done, or omitted, concerns the lands or estate, that is the medium which creates the privity between the plaintiff and defendant. I think the defendant's covenant respecting the rent run with the land, and that therefore the plaintiffs as grantees of the reversion could maintain this action for a breach of that covenant. (*Norman* v. *Wells*, 17 *Wend*. 136, 149.) The report must be set aside.

Motion granted.