# THE COMMERCIAL BANK OF PENNSYLVANIA *vs.* THE UNION BANK OF THE CITY OF NEW YORK.

A bank receiving a bill from the owner, for collection at a distant place, is liable for the neglect, omission, or want of diligence of the banks or other agents who may be employed by it, in the collection of the bill. It has therefore such a special interest in the bill as will enable it to maintain an action against a bank to whom it transmits the bill for collection, for a neglect of duty by the latter or its agents in collecting and paying over the proceeds, or in charging the parties. WRIGHT, J. dissented

In such a case, the plaintiff being liable to the owner of the bill in case the amount thereof is lost through negligence, may maintain an action against the bank employed by it, without waiting for a recovery against the plaintiff by the owner, upon such liability.

A bill drawn upon W., at Troy, payable at sight, was sent to the Troy City Bank, for collection, and was received by it on the 19th of November. On the same day it was presented to W. for payment. Though W. had not funds on deposit to pay the bill, his check for a greater amount was received, and the bill delivered up as paid. Subsequently, on that day and the next, deposits were made, in cash and drafts on New York, to an amount exceeding the check.

Commercial Bank of Penn. *v.* Union Bank of New York.

The drafts were never paid. On the 22d of November, W. informed the cashier of the Troy City Bank that his drafts on N. Y. would not be paid, and returned to the cashier the bill, and on the same day the bill was presented and protested for non-payment, and notice sent to the drawers and indorsers. *Held*, that if the bill was not to be considered as paid by the deposits made by W. on the 19th and 20th of November it should have been protested on the 19th, the day it was presented, and notice given to the drawer and indorsers, at the latest, on the next day; that the demand of payment on the 22d was too late; and that consequently the Troy City Bank was guilty of such *laches* in collecting or protesting the bill as rendered it liable to the holder, for the amount thereof.

Witnesses may be examined, under a commission, in respect to an original paper, by annexing a copy thereof to the interrogatories, and producing the original upon the examination and having it identified by the witnesses. The original need not be annexed to the interrogatories.

An interrogatory, requiring a witness to state the usual mode of transferring notes and drafts from one bank to another, is not objectionable as involving the decision of a question of law.

Where it appears, on the trial, that before witnesses were examined, under a commission, the plaintiff's attorney had, at their request, framed, in substance their answer to the interrogatories, this is not of itself a sufficient ground for suppressing the depositions. The circumstance only affects the credibility of the witnesses.

THIS was an action of assumpsit, tried at the Rensselaer circuit in December, 1849, before Justice HARRIS. The declaration contained, besides the usual money counts, two special counts, in one of which it was alleged that the plaintiff being the holder of a bill of exchange drawn at Wilmington, Delaware, on the 15th day of November, 1847, by P. M. Hutton, upon Thomas E. Warren, of Troy, in favor of Betts, Harlan & Hollingsworth, for $11,421.55, payable at sight, delivered the same to the defendants for collection, and that the defendants, on the 19th day of the same month, received payment of the bill and delivered the same to the drawee; and that they refused to pay the plaintiffs the proceeds of the draft. The other count alleged that the defendants received the bill of the plaintiffs for collection, and promised to collect it; that with reasonable diligence it might have been collected, and yet the defendants neglected to have the same presented for acceptance or payment, and had also neglected to give notice of non-payment to the

Commercial Bank of Penn. *v.* Union Bank of New York.

drawers and indorsers, whereby they became discharged from their liability. The defendants pleaded the general issue.

Upon the trial it appeared that the draft in question had been drawn by the agent of Warren, the drawee, and delivered to the payees in satisfaction of the balance due them from Warren, for building a vessel for him ; that the draft was indorsed by the payees, and on the same day deposited with the Bank of Wilmington and Brandywine, and credited by that bank to the payees as for so much cash deposited. On the same day, the Bank of Wilmington and Brandywine indorsed the draft by their cashier, payable to the plaintiffs' cashier, and forwarded the same by mail to the plaintiffs for collection. On the 17th of November, the plaintiffs' cashier indorsed the draft, payable to the defendants' cashier, and forwarded the same to the defendants at the city of New York. On the 18th of November, the defendants' cashier received the draft and forwarded it by mail to the Troy City Bank for collection, by which bank it was received on the morning of the 19th. On the same day, the teller of the Troy City Bank presented the draft to Warren at the bank, and he there drew his check upon that bank for $17,767, to include this draft and some other sums; which check was received and charged to his account, and the draft delivered to Warren. At the time the check was made, Warren had not funds in the bank to meet it. After bank hours, the same day, Warren deposited in the Troy City Bank funds to the amount $28,348, of which sum $14,000 were in drafts, at sight, upon Messrs. Houghtons of New York, which drafts were not paid. The drafts, at the request of Warren, instead of being forwarded directly to New York, were retained until the next day, and then paid out in Albany. The Messrs. Houghton continued to accept and pay the drafts of Warren during the 20th of November, which was Saturday. On Saturday, Warren drew his checks upon the bank for about $18,000, which were paid. On the same day he made deposits to about the same amount ; of this, $13,000 were in drafts upon Messrs. Houghton, which were not paid. The transactions of Warren with the bank during the fall amounted to $20,000

or $30,000 per day. His practice was to draw through the day for such funds as he wanted, and settle the amount in the evening. On Saturday or Sunday, Warren advised the Houghtons not to pay any more of his drafts. On Monday, the 22d of November, Warren informed the cashier of the Troy City Bank that his drafts would not be paid, and upon his request returned to him the draft which had been given upon the 19th, and on the same day the draft was protested for non-payment, and notice duly sent to the drawers and indorsers. The cashier of the Bank of Wilmington and Brandywine, and of the plaintiffs' banks, were severally examined as witnesses for the plaintiff, upon commission. Various objections were taken to the reading of their depositions in evidence, which are sufficiently noticed in the opinion of the court. The proofs being closed, the defendants' counsel moved for a nonsuit, upon the following grounds: 1st. Because it appeared by evidence uncontradicted that the Bank of Wilmington and Brandywine, employed the Commercial Bank of Pennsylvania to collect the draft in question, and admitting the former to have owned the draft at the time it was forwarded for collection, the suit for negligence to collect, or failure to pay over, the money received, if collected, could only be maintained by the former against its immediate agent, and not a remote agent like the defendants. 2d. That the defendants having received the draft for collection, they discharged their duty by transmitting it to the Troy City Bank where the drawer resided. 3d. That the draft was not paid by the check given by the drawer on the morning of the 19th of November, he having no funds in the bank at the time, and having failed to make the check good afterwards. 4. That the drawee had three days grace upon the draft, and it having been presented on the 19th, and protested for non-payment on the 22d, the protest was in due time. 5. That cashiers of the several banks through which the draft had passed having all canceled their indorsements, the right of the plaintiff, if it ever had any, was also canceled. The judge denied the motion, and decided that the plaintiff was entitled to recover the amount of the drafts with interest. The defendants excepted.

*J. A. Spencer*, for the plaintiff.

*J. Pierson*, for the defendants.

HARRIS, J. The Bank of Wilmington and Brandywine received the draft in question from Betts, Harlan & Hollingsworth, the payees and holders thereof, and gave them credit for the amount; that bank thereby became its owner. The Troy City Bank received the draft for collection, and failed either to collect the draft, or to protest it, so as to charge the parties who would have been liable to the owner for its payment. The Bank of Wilmington and Brandywine is therefore entitled to indemnity for its loss, and the Troy City Bank is liable for its failure to discharge the duty it took upon itself when it received the draft for collection. The question then is how the plaintiff and the defendants, the immediate parties to the transaction, are affected by the right of the Bank of Wilmington and Brandywine to indemnity, and this liability of the Troy City Bank. That the plaintiff is liable to the Bank of Wilmington and Brandywine, is settled by the authority of *Allen* v. *The Merchants' Bank of New York*, (22 *Wend.* 215.) The resolution of the court for the correction of errors in that case is, that when a bank, upon a good consideration, receives a note, or a bill, for collection *at a distant place*, the party receiving the same for collection, is liable for the neglect, omission, or other misconduct of the bank or agent to whom the note or bill is sent, either in the negotiation, collection or paying over money, by which the money is lost or other injury sustained by the owner of the note or bill, unless there be some agreement to the contrary, expressed or implied. Upon this principle, the Merchants' Bank of New York, which had received from the Messrs. Allen a draft upon a mercantile firm in Philadelphia for collection, and had transmitted it for the same purpose to the Philadelphia Bank, was held liable to the owners of the draft for the neglect of the notary of the latter bank in giving notice of the non-acceptance of the draft, so as to charge the indorsers. (*See also Downer* v. *The Madison County Bank*, 6 *Hill*, 648.)

In the *Bank of Orleans* v. *Smith*, (3 *Hill*, 560,) Nelson, Ch. J., while he still seems to prefer the rule as it had been declared by the supreme court in *Allen* v. *The Merchants' Bank*, and as it undoubtedly exists in some-other states, considers the doctrine as settled by the decision of the court of errors. In the case last cited, it was held that the party who deposits commercial paper, payable at a distant place, with a bank for collection, may hold any of the parties through whose hands it has passed in its transmission to the place of payment, answerable for any default in the collection of the paper. In that case Smith was the holder of a note payable at Buffalo. He left it for collection with the Merchants' and Mechanics' Bank of Troy. That bank transmitted it to the Bank of Orleans, and the latter to the Commercial Bank of Buffalo. The Bank of Orleans supposing the note had been collected by its correspondent at Buffalo, paid the amount to the bank at Troy, and that bank had also paid it to Smith. It turned out that the note had not in fact been paid, and that no laches were imputable to any of the parties. The Bank of Orleans sued Smith for the money thus paid through mistake. It was insisted that the Merchants' and Mechanics' Bank of Troy alone was liable to the plaintiff. But it was held that the Bank of Orleans might be considered as the agent of Smith as well as the bank from which it received the note ; and having, as such agent, paid the money, and the same having been received by Smith as the owner of the note, the action, though it might have been maintained against the bank at Troy, was properly brought against the principal. According to the principle of this case then, the Bank of Wilmington and Brandywine might at its election have maintained its action against either of the three banks to which the draft had been transmitted for collection. The Commercial Bank of Pennsylvania was liable not only for the default of the Union Bank, to which it transmitted the draft for collection, but also for the default of the agent at Troy, employed by the latter bank, and so passing by the Commercial Bank of Pennsylvania, the owners of the draft might have looked directly to the Union Bank or the Troy City Bank, and regarding it as its

Commercial Bank of Penn. *v.* Union Bank of New York.

own agent, have held either liable for the laches through which the draft was lost. The same evidence which would establish the liability of one, would equally establish the liability of either of the others. If the plaintiff in this action had been compelled to pay the amount of the draft to the Bank of Wilmington and Brandywine, by reason of the laches of the Troy City Bank, it will not be denied that upon the same evidence it might have sustained an action against either the Union Bank or the Troy City Bank.

The question still remains, whether being itself liable to the Bank of Wilmington and Brandywine, the plaintiff may maintain its action against the Union Bank or the Troy City Bank, without waiting for a recovery against it upon its own liability. To hold that the action cannot be maintained, would be contrary to the policy of the law, which always seeks to avoid a multiplication of suits by sustaining the action directly against the party ultimately liable. " Why," said Nelson, Ch. J., when the same argument was urged by the defendant, in the *Bank of Orleans* v. *Smith*—" why bring the action against the Bank of Troy ? They were but the agents of the defendants, and a recovery against them would only have the effect of multiplying actions, as they would have an immediate remedy over against the defendant."
If, according to the principle laid down by the supreme court, in *Allen* v. *The Merchants' Bank*, (15 *Wend.* 482,) the only duty assumed by the plaintiff upon receiving the draft, was, that the draft should be forwarded in due season to some competent agent at the place of payment ; then, indeed, having discharged that duty, there would be no ground for maintaining the action—no injury could have been sustained by the plaintiff. But since by the doctrine established by the court of errors, in *Allen* v. *The Merchants' Bank*, the plaintiff became answerable for the diligence of the agents who might be employed in the collection of the draft, it had such a special interest in the draft as would enable it to maintain an action for the injury it had sustained. Though the Bank of Wilmington and Brandywine was the *general* owner, the plaintiff, to which the draft had been indorsed and delivered for a special purpose, became a special owner. It

was bound to return to the general owner of the draft either the money or the draft *duly protested.* And if, through the negligence of the defendants, or any agent employed by the defendants, it was unable to discharge this duty to the owner, I see no reason why it should not be permitted to maintain an action for the injury. The case, I think, falls within the principle of that larger class of cases, in which the action may be maintained, either by the principal or the agent. Thus, a factor may sue in his own name for the price of goods sold for his principal; so an auctioneer may maintain an action in his own name for goods sold by him. In these and similar cases, while the agent has such a special property in the subject matter of the action that he is authorized to sue in his own name, the principal also may maintain an action upon the contract of his agent, and, in general, a suit by one will supersede the right of the other to sue. (*Story on Agency,* § 393 *to* 402.)

In this case the Bank of Wilmington and Brandywine had, by indorsement in due form, transferred the draft to the plaintiff. Having the possession of the draft thus indorsed, the plaintiff was clothed with the legal evidence of ownership. As such owner, the plaintiff transmitted the draft to the defendant. The parties dealt with each other as principals. By receiving the note from the plaintiff for collection, the defendants engaged with the plaintiff, as the plaintiff had engaged with the Bank of Wilmington and Brandywine, that the proceeds of the draft, or the draft duly protested, should be returned to the plaintiff. Having failed in discharging this duty, it is no answer to the action to say, that the plaintiff is under a similar obligation to another party. Nor is it any answer to say, that the real principal has a right also, as an implied party, to avail himself of the obligation which the defendants had assumed with the plaintiff. It is by reason of the plaintiff's responsibility to its principal that it has an interest in maintaining this action for its own indemnity. " It may be laid down as a general rule," says Story, " that wherever an agent, although known to be such, has a special property in the subject matter of the contract, and not

Commercial Bank of Penn. *v.* Union Bank of New York.

a bare custody thereof, he may in all such cases, sue upon the contract." (*Story on Agency*, §397; *see also the Bank of Utica* v. *McKinster*, 11 *Wend.* 473.)

It cannot be doubted, I think, that the plaintiff had such a special property in the draft, as entitled it to maintain an action against the defendants for the injury it had sustained by the default of the defendants' agent in collecting or protesting the draft. The plaintiff had the legal right to recover the damages which the defendants had incurred by reason of such default, so that it might be indemnified against its own liability upon its own undertaking with its principal. It was upon this principle that it was held by the court of errors, in *Miller* v. *Adsit*, (16 *Wend.* 335,) that a receiptor of property taken in execution, being bound to return the property or pay the execution, had such a legal interest in the property as entitled him to maintain an action against a third person who had taken the property, although it had been left in the possession of the defendants in the execution. I think, therefore, that the action was properly brought by this plaintiff, and against these defendants.

It has thus far been assumed that the facts in this case, in respect to which there was no dispute, showed such *laches* as would render the Troy City Bank liable for its failure to collect, or duly to protest, the draft. But as the defendants' counsel have made a point upon that question, it is proper that it should receive a moment's notice. The draft was received at Troy on the morning of the 19th of November. At the opening of the bank on that day it was presented by the teller to Warren for payment. Though he had not funds upon deposit to pay the draft, his check for the amount of the draft, with some other items, was received, and the draft delivered up as paid. Subsequently, on that day, and the day following, cash deposits were made to an amount greatly exceeding the check which was used in the payment of the draft. I suppose that these deposits were applicable to the payment of the check used for the purpose of taking up the draft in preference to other similar advances made subsequently. (*Allen* v. *Culver*, 3 *Denio*, 284. *Webb* v. *Dickinson*, 11 *Wend.* 62. *Seymour* v. *Van Slyck*, 8

*Id.* 403.) But if this be not so, it was quite too late to protest the draft on the 22d. It had been received, and as the parties understood, paid and given up, on the 19th. If not paid, it should have been protested on the same day it was presented. Notice should have been given to the drawer and indorsers, at the latest, on the next day ; and yet the draft was suffered to remain in the hands of Warren from the 19th to the 22d, when it was obtained from him and protested. This was too late to charge the drawers and indorsers. It being a sight draft, no days of grace were allowed upon it, and without reference to what had occurred on the 19th, the demand of payment on the 22d was too late.

Nor have I been able to perceive any sufficient grounds for suppressing the depositions of the two cashiers. A copy of the draft was annexed to the interrogatories, and the witnesses were asked, among other things, if they had ever seen the original of such copy ; and, if so, under what circumstances and when. By other interrogatories, the cashier of the Bank of Wilmington and Brandywine was required to state the facts in relation to the transfer of the draft by Betts, Harlan & Hollingsworth to the Bank of Wilmington and Brandywine, and the transmission of the draft for collection. The cashier of the plaintiff's bank was also required to state the facts in relation to the transmission of the draft to New York for collection. At the taking of the deposition of each witness, the original draft was present and identified. Each verified the copy annexed to the interrogatories as being a true copy. The defendants' counsel insisted, on the settlement of the interrogatories, that these interrogatories ought not to be allowed, because they related to a copy of the draft, without producing the original or proving it lost, thereby seeking to give *parol* evidence of a written instrument. Upon the trial the further objection was taken that the plaintiff had no right to give evidence of the original draft without allowing the defendants to see the same before the witnesses were examined. In respect to the latter objection it is enough to say that it is hypothetical. It does not appear whether the defendants' counsel in fact saw the draft or not. If he did not, there is no reason to believe he might not have seen it,

Commercial Bank of Penn. *v.* Union Bank of New York.

if he had sought the opportunity. I think, too, that the other objection is equally unfounded. Instead of describing the draft in respect to which the witnesses were to be examined, in the body of the interrogatories, a copy was annexed and referred to. It was no more than a convenient mode of description. When several witnesses are to be examined under different commissions, in respect to the same instrument, I know of no other practicable mode of proceeding than that pursued in this case. Upon the examination, the original was in fact produced and identified by each witness. In all this I cannot see that any rule of evidence has been violated.

By one of the interrogatories administered to the cashier of the Bank of Wilmington and Brandywine, he was required to state the usual mode of transferring notes and drafts from one bank to another. This was objected to, on the ground that it involved the decision of a question of law. In this, too, I think the defendant's counsel is mistaken. The witness is interrogated in respect to a mere matter of fact; that is, how a certain kind of business is done. What might be the legal effect of doing the business in the mode described by the witness, is a question which would still remain to be determined.

In answer to the concluding general interrogatory, each witness has in substance repeated the facts he had previously stated in answer to the specific interrogatories, and perhaps has added some other statements. No motion was made to suppress the answer to this interrogatory, or any part of it. But if such a motion had been made, I do not see why it should be granted. So far as the same facts were re-stated by the witnesses, the defendants certainly could not be prejudiced, and if any new matter was stated bearing upon the matters in issue, it was no more than the duty of the witness required him to state. If the defendants had desired to cross-examine the witnesses in respect to any new matter there stated, they should have applied to have the commission sent back for that purpose. It was too late to raise such an objection at the trial.

It had appeared on the cross-examination of the plaintiff's attorney, who was called as a witness upon the trial, that before

the witnesses were examined under the commissions, he had at their request, framed in substance their answers to the interrogatories. This fact was relied upon by the defendants' counsel, as of itself a sufficient ground for suppressing the depositions. Such a mode of preparing witnesses for their examination certainly is not to be commended; but I think, as it was held upon the trial, that these circumstances only affected the credibility of the witnesses. Testimony thus prepared, where it is designed to affect a controverted question, ought to be received with great caution. But the commission was executed in the manner prescribed by law. The commissioners obeyed their directions. There is therefore no ground for excluding the evidence. Like the testimony of any other witness who has been subjected to improper practices before he is examined, it must be taken for what it is worth. The circumstances affected the credibility and not the competency of the evidence. In this particular case there is no reason to believe that the witnesses had, in the slightest degree, varied from the truth. Indeed, the facts to which they testified were not controverted upon the trial. The defendants relied exclusively upon the legal questions involved in the case. It was not even requested that the evidence should be submitted to the jury.

The only other point made by the defendants' counsel is, that the erasure of the indorsements of the cashiers of the Bank of Wilmington and Brandywine, and the plaintiff's and defendant's bank, canceled the interest of the plaintiff in the draft, if it ever had any, and that for this reason the action cannot be maintained. These erasures were made, as the defendant's counsel concedes, when the draft was returned under protest, and probably before the circumstances which establish the liability of the defendants were known. If the defendants were liable to the plaintiff at all, they were liable in consequence of the failure of the Troy City Bank to discharge its duty in the collection of the draft. That liability was fixed before the draft was returned, and of course, before the indorsements had been erased. The fact that the indorsements were erased, or even

that the draft itself had been destroyed, could not have the effect, of itself, and without any intention to discharge such liability, to destroy the plaintiff's right of action. I am of opinion that no error was committed upon the trial, and that the motion for a new trial should be denied.

PARKER J. concurred.

WRIGHT, J. (dissenting.) The action is against the defendants, the corresponding bank of the plaintiffs. It is not pretended that any thing has been collected on the draft, by the Union Bank. If liable, it is for the negligence or misconduct of the Troy City Bank, to whom they transmitted the paper for collection. In *Allen* v. *The Merchants' Bank of New York*, (15 *Wend. R.* 482,) this court decided that when a bill of exchange, payable at a distant place, is deposited with a bank for collection, without any agreement for compensation, the only obligation incurred is to forward the bill in due season to a bank or other suitable agent, at the place of payment, with directions to take the necessary measures to obtain payment; and accordingly when a bill was thus forwarded, and the bank receiving it placed it in the hands of a notary to make presentment for acceptance, which was made and refused, and the notary omitted to give notice to an indorser, whereby the debt was lost, it was held that an action would not lie against the bank where the bill was originally deposited, but the holder must seek his remedy against the foreign bank or notary. This appears to have been the general commercial rule. (*Bank of Washington* v. *Triplett*, 1 *Peters' R.* 25. *East Haddam Bank* v. *Scoville*, 12 *Conn. R.* 304. *Fabens* v. *Mercantile Bank*, 23 *Pick. R.* 330.) But the court for the correction of errors reversed the decision of this court, in *Allen* v. *Merchants' Bank*, (22 *Wend. R.* 215,) holding that a bank receiving paper for collection at a distant place is liable, in the absence of any special agreement to the contrary, for any neglect of duty occurring in its collection, though arising from a default of its correspondents, to whom the paper was transmitted,

or of agents employed by such correspondents. Thus the law as settled by the court of errors, holds the defendants in this case liable to the owner of the draft in question for the negligence, omission or misconduct of the Troy City Bank, or of the notary employed by it. Whatever opinion we may entertain of the soundness of the doctrine, this court has no recourse but to follow it.

But can the plaintiff (the Commercial Bank of Pennsylvania) maintain the action? The proof showed, and indeed it was conceded throughout the case, that the Bank of Wilmington and Brandywine was the owner of the draft. It was transmitted by that bank to the plaintiffs, as its agent, for collection. They received it as agents, and for the purpose of collection, and none other. They lose nothing by a neglect or omission to properly charge the drawer or indorsers. They are not the persons damnified, or who suffer by the negligence or misconduct of the defendants, or their sub-agents. The action is not brought to recover upon the draft itself. Though assumpsit, in form, it is founded in negligence or omission of duty. Is such a right of action assignable? I think not. But if so, there is no pretense that the Bank of Wilmington and Brandywine have assigned the cause of action to the plaintiff. The learned judge who tried the cause held " that though the plaintiffs were the mere agents of the owners of the draft to collect the same on their account, yet under the circumstances which appeared in evidence, they had sufficient interest in the draft to enable them to maintain the action." In this I am at a loss to discover the meaning of the judge. If not the owners of the draft, what interest had they in it? What property in the chose in action lost by the negligence of the Troy City Bank? It cannot be pretended that the indorsement of the draft, at the time it was transferred to the plaintiffs for collection, vested the legal title in them, so as to clothe them with the rights of owners. The indorsement was for a specific purpose, viz: to facilitate the collection for the owners, and the indorsement was stricken out before this suit was commenced. It is not perceived, therefore, what personal interest the plaintiffs had in the draft in question at the commencement of this action; and it seems to me clear

upon general principles, that having no such interest in the debt alleged to have been lost by the negligence or misconduct of the defendants or their sub-agents, they are not the proper parties to maintain a suit for the recovery of damages for such negligence or misconduct. Here we are presented with the naked case of an agent employed to collect a draft, liable to respond in damages to his principal for negligence or omission of duty, but who has not been charged with such damages, and never may be, seeking to maintain an action against the agent employed by him, for the recovery. Should he recover, and appropriate the avails to himself, is it clear that such recovery would be a bar to an action brought directly by the principal against the sub-agent? Suppose, that in this case, the verdict obtained by the Commercial Bank of Pennsylvania be permitted to stand, and after being realized by such bank it refuses to pay, as the institution becomes insolvent, will the Bank of Wilmington and Brandywine be barred of their remedy against the defendants? If not, we have a rule not only enabling the principal to recover for the default of a remote agent but also an intermediate agent, whose liability has not been legally fixed, and never may be.

The Bank of Wilmington and Brandywine being the owner of the draft in question, might have prosecuted directly against the Troy City Bank, for the distant agent is to be considered the agent of the holder as well as of the bank transmitting the paper. (*Bank of Orleans* v. *Smith*, 3 *Hill*, 560.) Thus a multiplication of actions would be avoided. This course is not taken, nor any course on the part of the persons having the beneficial interest and property even as against the immediate agent. One agent brings an action against another intermediate agent. How does this subserve the policy of the law which seeks to avoid a multiplication of suits by sustaining the action against the party ultimately liable? But if the action had been against the Troy City Bank, or the notary, who in this case are to be regarded as ultimately liable, the doctrine of avoiding multiplicity of actions could have no application.

The *person who sues must have the right to do so :* unless this be so, it matters not whether the action be against a party presently or ultimately liable.

It seems to be conceded that the plaintiffs must have a special property, or a direct beneficial interest in the draft, to enable them to maintain the action in their own names. That they have none either in law or by the usage of trade, is the difficulty that I am unable to overcome. The fact of intrusting to an impolitic agent that which they should have performed themselves, or having themselves discharged their agency with such *laches* as to render them answerable to their principal in law, certainly, gives them no property in the subject matter of the agency, or any beneficial interest in the thing itself. The plaintiffs occupied the position of ordinary agents. They undertook to perform a service for the owner of the draft, viz : to collect it. In undertaking this duty they are understood to have contracted for reasonable skill and ordinary diligence, and consequently are liable for injuries to their employer, occasioned by ordinary negligence or want of reasonable skill. But, unlike some other classes of agents, they had no property or *lien* upon the draft or the debt of which it was the evidence, or the proceeds of the draft. An auctioneer, who for some purposes may be deemed an agent for both vendor and vendee, has a *lien* on the goods sold by him, and the proceeds thereof, for his commissions, and has an unconditional authority to sue the purchaser in his own name as being not merely agent but a contracting party. So also a factor, who has the possession, management, control and disposal of the goods to be bought and sold, has a special property in them, and a lien on them not only for commissions but for advances, and not only on the property itself but its proceeds. He may buy and sell goods in his own name for his principal, and for many if not for most purposes (except between himself and his principal) he is treated as the owner of the goods. He may sue in his own name for goods sold by him for his principal, and is also liable to be sued for goods bought by him for his principal. These classes of agents have peculiar duties and peculiar functions resulting from the

general usage and habits of business and trade, and which have been repeatedly the subject of legal recognition. " It may be laid down," said Judge Story, " that wherever an agent, al-. though known to be such, has a special property in the subject matter of the contract, and not a bare custody thereof, or where he has acquired an interest in it or has a *lien* upon it, he may in all such cases sue upon the contract." (*Story on Agency,* § 397.) Auctioneers and factors are classes of agents having a special property in the subject matter of the agency and a lien upon it, and consequently by the usage of trade and by well recognized principles of law, may maintain actions in their own names respecting the property intrusted to their control, management and disposal. But even in these cases the principal may generally supersede the right of the agent to sue, by suing in his own name. How then can it be said that the plaintiffs in this case fall within the rules which authorize auctioneers and factors to sue in their own name to enforce the rights of their principals ? Auctioneers and factors, it has been seen, are classes of agents having peculiar duties and functions, well understood and defined by usage, legally recognized, and they have a special interest in and lien upon the property intrusted to them. The case of the plaintiff is that of a pure agency, where there is no lien or other interest or superior right in the claim, in the chose in action, or in its proceeds, or in the debt of which it is the evidence. I know of no adjudged case, nor have we been referred to any, as an authority for such an agent to maintain an action in his own name ; and if there be none, how are the defendants to be protected hereafter (there being a recovery in the case) against the suit of the principal, the owner and holder of the draft ?

On the argument we were not referred to any authority claiming to bear upon the point of the right of the plaintiffs to maintain the action, except the case of *Miller* v. *Adsit,* (16 *Wend. R.* 335.) That case holds that replevin may be maintained by a *receiptor* of goods, where he is bound to deliver them by a specific day or pay the amount of the execution under which the levy was made, although the property be left by him in the

actual possession of the defendant in the execution. This court had decided that a receiptor to an officer for property levied on so that it might be forthcoming at the day of sale, not in his actual possession could not maintain replevin against a mere stranger, for the reason that the receiptor was to be viewed in the light of a mere surety to the officer for the defendant in the execution. The engagement of the receiptor was that he would keep safely and be responsible to the officer to the value of the property, that it should be forthcoming. He had also a constructive possession of the property. The court of errors held, that under the circumstances he was not to be regarded as the mere surety of the defendants, or as the servant or agent of the officer, or a mere depository having no property whatever in the deposit, but the custody only. That if he could not maintain replevin against a wrongdoer in possession alone, he was not to be considered a naked bailee; but a bailee from the responsibility which he had assumed, having the right to maintain an action for injury to the property on the strength of his special property. In short, the case merely determines what before had not been law in this state, that a receiptor occupies a relation other than that of surety for the defendant; and that being answerable for more than due care and diligence in the safe keeping of the property, he is to be deemed to have a special property that will enable him to maintain an action against a wrongdoer, to recover its possession. Whether decided upon strict principle or not, I cannot perceive that it has the remotest bearing upon the case under consideration. No member of the court attempted to overthrow the universal doctrine, that a mere agent could not sue; the right of action being with the principal and no one else.

I am of the opinion that the action cannot be maintained by the plaintiffs. We may make this case a precedent, but not otherwise. They were not the owners or holders of the draft, nor had they any personal interest in or lien upon it. They were but the agents of the Bank of Wilmington and Brandywine to collect it. As such agents, it is true, they were responsible for their own negligence, and that of those with whom

they may have intrusted the business. But no recovery has been had against them for any default. Their liability has not been fixed, and may never be. The owner and holder of the draft—the principal, the sole party to be injured by negligence— does not complain. The plaintiffs have not been damnified by the acts or omissions of the defendants.

There should be a new trial with costs to abide the event.

Motion for new trial denied. (*a*)

[ALBANY GENERAL TERM, December 5, 1853. *Parker, Harris* and *Wright,* Justices.]

(*a*) Affirmed by Court of Appeals. *See* 1 *Ker.* 203.