# HENRY *v.* THE DUBUQUE AND PACIFIC RAILROAD COM- PANY.

Section eighteen of the first article of the constitution of the state of Iowa, which provides that private property shall not be taken for public use, without just compensation, means that the person whose property is so taken, shall have a *fair equivalent in money*, for the injury done him by such taking.

The term "damages," in the fourth section of the act entitled "An act grant- ing to railroad companies the right of way," approved January 18, 1853, has relation to the provision of the constitution under which the property may be taken, and is *precisely synonymous* with the phrase "just compensation," there used.

The just compensation to which the owner of the land is entitled, should be precisely commensurate with the injury sustained by having the property taken—neither more nor less.

The right of way conferred by the statute, and acquired by a railroad com- pany, is the right of way peculiar to a *railroad*, and contemplates all which is necessary and proper for the construction and maintenance of a railroad over the premises.

It is the right (within the limits of quantity, as allowed by the statute to be taken), to all freedom in locating, constructing, and conveniently using and repairing the road and its appurtenances; and for such purpose only, of taking, removing and using any earth, gravel, stone, timber, or other mate- rials, on or from the land so taken.

As a railroad is designed to be a level road, or nearly so, the right to construct, includes the right to make deep cuts, or high embankments, as the topogra- phy of the land may require.

As the convenient use of a railroad contemplates rapid locomotion, all the rights necessary thereto, as against the owner of the fee, are incident to the appropriation of the land for railroad purposes.

The right of way acquired by a railroad company, is not limited to the life of the charter, or articles of incorporation, of the company, but is intended to be perpetual, if the company, its grantees, or assigns, continue to occupy the land for the purposes for which it was appropriated.

The fee of the land appropriated for railroad purposes, remains in the owner, subject to the easement acquired by the company; and the rights of the company and those of the owner in fee, are as distinct and separate, and each is as independent of the other, as the rights of adjoining land owners in fee.

Any *reciprocal relation* that subsists between railroad companies and the own- ers of the fee of land, is either founded on agreement, or created by statute; and the only relation of this character, which exists by statute, is that cre- ated by section sixteen of the act granting to railroad companies the right

Henry v. The Dubuque and Pacific R. R. Co.

of way, approved January 18, 1853, which provides that where a person owns land on both sides of the road, the corporation may be required to furnish a crossing.

Where no statutory regulation exists, defining the duties of railway companies as to fence, they are under no obligation to erect fences between their road and the adjoining land.

Chapter fifty-two of the Code, regulating partition fences, is not applicable as between the owner in fee of land and a company having a right of way for a railroad over such land.

As no reciprocal obligation exists between the owner of the right of way over, and that of the fee, in land, whereby either may compel the other to fence, the *building of fence* is not necessarily an element to be taken into consideration by the commissioners, in assessing the damage occasioned by the right of way.

The proper mode of ascertaining the damages occasioned by taking the right of way over land, is to determine the fair marketable value of the premises before the right is set apart, and then again after; and the difference will be the true measure of damage; and when paid, will be, in a legal sense, just compensation.

The *present values*, taking into consideration the extent of the rights conferred, are those which are to be arrived at; and the *immediate* and *necessary consequences* of parting with the right conferred, must necessarily enter into the consideration of the commissioners, in assessing the damages.

The premises, as *left* in the condition they will be, after the right of way is taken, together with the damages assessed, should be equal in value to the premises, immediately before the taking of such right of way.

In assessing the damages, all the circumstances that *immediately* depreciate the value of the premises, by taking the right of way, are proper to be considered, and none others.

In case the land was fenced, and by taking the right of way, it is thrown open, and left in a manner unfenced, this fact will be taken into consideration in arriving at the depreciated value of the remaining premises.

How the road may affect the value of the land, if completed, or any other consideration of *future* benefit; or any *abuse* of the privilege, or probability of abuse, by the company; or any unwillingness on the part of the owner to allow the road to go over his land, is not in any manner to be considered, in the assessment of the damages, arising from taking the right of way.

Where an appeal is taken from the finding of the commissioners appointed to assess the damages created by taking the right of way, and the appeal is heard in the District Court before a jury, the witnesses called by the respective parties, may be permitted, on their examination in chief, to give their *opinion* of the *value* of the premises *before and after* the taking of the right of way, leaving the opposite party, by his right of cross-examination, to learn the ability of the witness to judge in the premises, and what he takes into consideration in making up his judgment.

But in such cases, the opinions of the witnesses must be confined to the premises over which the right of way is taken.

Henry v. The Dubuque and Pacific R. R. Co.

*Appeal from the Dubuque District Court.*

THIS case was before the District Court on an appeal from the finding of six commissioners, appointed by the sheriff to assess plaintiff's damages, on account of defendants having laid their road over his land. The bills of exceptions show, that on the trial of the cause, the court established the following rules and regulations, to be observed in the propounding of questions, in relation to the extent of damages:

1. What was the fair cash value of the land taken, at the time it was taken for public use, if the owner were willing to sell, and the company desirous to buy, that particular quantity at that place, and in that form?

2. Is it in the country, a village, or a city?

3. With reference to remaining land, is it on the outer line, with the bed of the road only on the land, or does it run so as to divide the land in a regular or awkward form?

4. Is it so run as to cut off from the main lot a portion of ground, that for quantity or form, is salable or not?

5. What sum will make the plaintiff as good as if the railroad had not been located on his land?

6. What sum will make his farm as valuable as it would be, if the railroad had passed over his neighbor's farm, and not his own? The general advantage of the railroad to the neighborhood of the land, is not to be taken into consideration, and deducted from the damages; but if it is of any special advantage to plaintiff—if it makes any particular lot more salable—if it drains some part of the land—or if it fertilizes some part—or if it opens an avenue to him, not common to others—all such and similar advantages are to be considered by the jury, and to be deducted from the damages which you may find.

7. What particular advantage is it to plaintiff as an owner of the land, because of the railroad being located through it, rather than upon some other land in the vicinity?

8. The general effect that the actual or contemplated construction of the railroad may have upon the value of the land, is not to form an element, or be considered in the valuation.

To each and every part of this ruling, the counsel for the railroad excepted. The bills of exceptions show further that claimant proceeded to interrogate witnesses in accordance with the above rules; that one witness testified, that in his opinion, considering the circumstances of the case, the claimant should receive two hundred dollars an acre for the quantity of land taken, or that the land taken was worth that much, taking into consideration the consèquences to the balance of the property; that the farm was worth about fifty dollars an acre as a whole, and that the strip taken was about as good as an average of the place. Another witness testified to one hundred and fifty dollars an acre for the quantity of land taken, taking into consideration the circumstances of the case as aforesaid; that the strip might be a little better than an average of the place; and that the whole place was worth about fifty dollars an acre. Several other witnesses expressed similiar opinions, varying somewhat in amount. The railroad company introduced evidence to show, that a station had been located on the adjoining forty acres of ground; that a town was being laid out there; and that the market value of the farm of claimant had been increased in value, in consequence of said station being so located; and also introduced the assessment roll made out by T. F. Henry, the father of claimant, under oath, in June, 1855, in which said lands were returned as worth fourteen dollars an acre; and it appeared in evidence that T. F. Henry was the assessor of that township, and was the agent of the claimant. A plot of the land and road was also introduced in evidence, by which the quantity of land taken appears to be between nine and ten acres.

The court instructed the jury, as follows: "This is an appeal by the plaintiff from the decision of the jury impanneled by the sheriff, to assess damages of plaintiff, resulting from the laying out the railroad through his land. The

question for you is, what damages will the plaintiff sustain by the appropriation of the land of the plaintiff, for the use of the railroad corporation? This is your inquiry as directed by the statute. This statute is founded on the right of eminent domain; it is the right to take private property for public use, when the good of the public requires its surrender, and this right is incident to sovereignty, and exists in every government. The obligation to make compensation, follows the right. The appropriation of the land is merely the right of way over it. The title to the land remains in the plaintiff, subject to the right of way of defendant over it. The question as to what is the rule of damages, is one which involves important considerations, and demands more reflection than I have been able to bestow since the investigation of this case commenced. The following rules will be observed by the jury in estimating plaintiff's damages.

1. You will inquire what was the fair cash value of the land appropriated, at the time it was taken, if the owner was willing to sell, and the company desired to buy, that particular quality, in that place and in that form?

2. With reference to remaining land, you will inquire whether the road is located on the outer line, with the bed of the road only on the land, or does it run so as to divide the land in a regular or awkward form?

3. Is it so run as to cut off from the main lot, a portion of ground that for quantity or form is valuable or not?

4. What sum will make the plaintiff as good, as if the railroad had not been located on his land?

5. What sum will make his farm as valuable as it would be, if the railroad had passed over his neighbor's farm, and not over his?

The general advantage of the railroad to the neighborhood of the land, is not to be taken into consideration, and deducted from the damages; but if it is of any special advantage to the plaintiff; if it makes any particular portion of his land more salable; or if it opens an avenue to him not common to others; all such, and similar advantages, are to

be considered by the jury, and to be deducted from the damages which you may find.

You will find a separate verdict for the value of building and keeping in repair the fence, during the time of the existence of the railroad charter.

To each and every part of these instructions, said company excepted, and asked the court to instruct the jury as follows:

3. That if the jury believe, that witnesses have testified that the strip of land taken was worth two hundred dollars; some one hundred and fifty, and some one hundred dollars; and that such witnesses based their opinion of the value, upon the injury which accrued to the balance of the land, and not upon the intrinsic value of the particular strip taken; that they should entirely reject and leave out such testimony, as being entirely illegal and improper; and that witnesses have no right to give any opinion of the value of the particular strip taken, upon a supposed injury done to the balance of the property.

4. That the just compensation which the appellant is entitled to receive in this case, is the amount of actual injury sustained. If the jury believe that the balance of his land is worth more now, than the whole farm would have been, if this railroad had not been projected, and that this increased value of the balance, is owing to the projection and location of this road; then they must find only nominal damages; that the plaintiff is not entitled to pocket the benefits, and then recover the full amount of all damages, leaving out of sight the benefits which he had received.

5. That the plaintiff cannot recover for the value of a fence which he has not constructed, nor is he entitled to recover damages and imaginary expense, which he may believe he will incur in keeping the fence in repair for the next fifty years; that there is no law authorizing the recovery of anything for a fence, nor for keeping a fence in repair.

The court refused these instructions, and defendant excepted, and asked the following instruction: " That if a town

is being laid out adjoining to the land, and the market value of this and the adjoining land is greatly increased in consequence of building the railroad, and the location of a station at the particular point, that this is matter to be taken into consideration, in ascertaining the amount of damages."

The court refused to give this instruction as asked, but added to it, "if the benefit is peculiar to plaintiff's land." To the refusal to give this instruction as asked, and the giving it as modified, defendant excepted.

The jury returned the following verdict: " We, the jury, agree to find for the plaintiff, and assess his damages at five hundred and ninety-one dollars on the land. We further agree to find for the plaintiff, and award him five hundred and ninety-two dollars for building the fence, and eight per cent. per annum, for keeping the same in repair for forty-eight years, to be paid annually." Whereupon the defendant moved for a new trial, on the following grounds:

1. That the verdict was contrary to the evidence and the weight of evidence.

2. The court erred on the points of law raised during the introduction of the evidence.

3. The court erred in allowing improper evidence to be laid before the jury.

4. In excluding proper evidence from the jury.

5. In its charge to the jury.

6. In refusing the third, fourth, and fifth instructions asked in behalf of the company.

7. In giving the opening and closing of the case to appellant, which motion was overruled by the court, and the court proceeded to render judgment on said verdict, for the sum of $1,183 and costs, in favor of said Henry, and also "that plaintiff have and recover of and from said defendant, the further sum of eight per cent, on the sum of five hundred and ninety-two dollars for the term of forty-eight years, to be paid annually on the 5th day of December, and that on the 5th of December, A. D. 1856, the said plaintiff, have execution against said defendant, for the sum of forty-seven dollars and thirty-six cents, besides the costs of execution.

And that the like execution issue each year from and after the 5th day of December, A. D. 1856, for forty-seven years thereafter, to be in full of said sum of eight per cent. on the said sum of five hundred and ninety-two dollars." From this judgment said company appeals, and assigns for error the following:

1. In allowing witnesses to give opinions to the jury, based upon consequential injuries supposed to have been done to other lands than those condemned.

2. In allowing witnesses to state opinions of the value of the land, based upon the idea that the land was within or near a village, when the evidence showed that the village consisted of a railroad station made by the company.

3. In allowing witnesses to state their opinion in relation to consequential injuries, but not as to consequential benefits.

4. In assuming that the said Henry was entitled to the benefit of the supposition, that the railroad would be located on the said neighbor's land, and leaving it to the jury to say what sum would make him as good as though it had not been so located.

5. In restricting the benefits accruing to the claimant to those which were peculiar to him, whereas the said company are entitled to set off all benefits accruing to the said Henry, though other people might have been benefited in the same way.

6. In refusing the third, fourth, and fifth instructions asked for by the railroad company.

7. In qualifying the seventh instruction asked by the company.

8. In overruling the motion for a new trial.

*Smith, McKinlay & Poor*, for the appellant.

Compensation and damages mean the same thing. See Const. of Iowa, in Code, 545; 2 Greenleaf's Ev. 243. Compensation for injury—recompense for actual loss—the actual loss—the extent of the injury—can be exactly fixed, by ascertaining the value just before the injury, and the value after the injury has been sustained; the difference of value before

it was injured, and the value in the damaged condition, will be an exact compensation for actual loss—this is the rule laid down by this court in the case of *Sater* v. *The Burlington Plank Road Co.*, 1 Iowa, 386 ; see also, Angel on Water Courses, 499 ; 14 Ohio, 173 and 541 ; Smith's Commentaries on Const. Law, 468 ; Sedgwick on the Measure of Damages, 110, 112. The compensation, the actual amount of damage, no doubt, should be paid in money ; nor do we offer to pay anything else.

As to the fence, it will be time enough to pay for it, when it is built ; the Code regulates that matter. § 909 ; *The Rensselaer and Saratoga R. R. Co.*, 4 Paige Ch. 553 ; 1 Amer. R. R. Cases, 214 ; 2 Harrison (New Jersey), 25.

This thing of recovering damages for fences, or anything else, before the damages really accrue, is not legal. 9 Barb. 256. The provisions of the Code are simple, and the propriety of such a provision, applies to this country with more force than it would in the old states, as cattle run here at large ; there they are kept up. *Quimby* v. *R. R. Co.*, 23 Vert. 387 ; *S. C.* in American Railway Cases, 251, quoted by the other side, recognize the principle of division fence.

When private corporations, or those that have private rights and stocks, take lands, they will be regarded as *persons*, and as such they will be liable to make their part of partition fences. But purely municipal corporations, being only a co-ordinate part of the government, will not be subject to the same rule. Railroad, plank road, and turnpike companies are only persons. The case quoted from 4 Chand. (Wis.) 82, is founded on a different constitution and law from ours. " The constitution required payment of the value of the *land taken*, but the statute gives the owner further, his damages, if there be any, by reason of the taking of his land, over and above benefits." Our constitution and law do not first give the value, and then the consequential damages in addition ; but there is to be a compensation for actual damages.

As to the opinion of witnesses, see 13 United States Dig. 564, § 76 ; *The Montgomery and West Point Railroad*

*Co.* v. *Varna*, 19 Ala. 185. The better mode is, to let witnesses state the facts, and leave the extent of consequential injuries to the jury. The cases quoted, showing that the claimant was entitled to the open and close of the case, arose under statutes materially different from ours. They are not only *claimants*, but *petitioners;* by our statute, they are not petitioners nor plaintiffs; they are virtually defendants.

*Burt & Barker*, for the appellee.

I. The expense of making and keeping in repair necessary fences, along the road, was properly included in the assessment of damages.

The statute requires the jury to " assess the damages the owner will sustain by the appropriation of his land." Laws of 1852, chapter 31, § 4. (See how different from plank road act, chapter 131, § 49.) The statute is designed to cover all claims for damages occasioned by the appropriation, and is exclusive of any remedy at common law. *Mason* v. *The K. & P. Railroad Co.*, 31 Maine, 215; 1 American Railway Cases, 166.

Railroad companies are not bound, by the common law, to fence their roads. The obligation to fence can only be imposed by statutory enactments. *Hurel* v. *R. & B. Railroad*, 25 Vermont, 116; *Langlois* v. *B. & R. Railroad Co.*, 19 Barb. 364; 1 American Railway Cases, 210, N. 212.

The statutes of this state do not require railroad companies to build any fences. Chapter 31, laws of 1852. The act in relation to division fences (chapter 52 of the Code), does not apply to railroad companies, for the reasons: 1. The railroad company do not, under the statute, acquire the title in fee, to the land appropriated, but simply an easement—the right of way. 2. The remedy would be inadequate, as the Code does not compel a land owner to fence, other than " inclosed land." 3. The whole language of the act precludes the application to railroads. *Quimby* v. *V. C. R. R.*, 23 Vermont, 387; *Dean* v. *Sullivan R. R. Co.*, 2 Foster, 316; 4 Paige, 553; 16 Barbour, 270; 15 Ib. 36; 2 Harrison, 25.

The appropriation of land through improved farm land, creates the necessity of building and maintaining fences which would otherwise not be required; and the company should, therefore, be compelled to pay the expense of fencing, as part of the damages the party sustains, by reason of the appropriation of his land.

It has been decided that the expense of fencing, was a proper item to be included in damages for land appropriated by railroad companies. *Curts* v. *V. C. R. R. Co.*, 23 Vermont, 613; *Quimby* v. *V. C. R. R. Co.*, 23 Ib. 387; *Morss* v. *B. & M. R. Co.*, 2 Cushing, 536; *Mason* v. *R. & P. R. Co.*, 31 Maine, 215; *The M. & M. R. R. Co.* v. *Eble*, 4 Chandler, 72; 4 Paige Ch. 553; *First Parish in North Bridgewater* v. *County of Plymouth*, 8 Cushing, 475; *George Lawton* v. *The Fitchburgh R. R. Co.*, 8 Cushing, 230; *Sater* v. *The B. & Mt. Pleasant Plank Road Co.*, 1 Iowa, 386. In the case in 4 Paige, 553, it is held that but one-half the cost of fencing should have been included in damages, as the railroad owned their land in fee, and the statute in relation to division fences, applied then in New York. The same reasoning that would compel an owner of the land appropriated, to build any part of the fence, would require him to build the whole. But no exception of this character was taken in the court below.

There is no error in the instructions of the court below. The charge of the court was too favorable to the appellant, upon the rule of damages. The "just compensation" required by the constitution to be made, when private property is appropriated to public use, means a full compensation; and it must be made in money, and not in speculative advantages of some future railroad, which he does not consent to purchase.

There is a class of authorities in some of the states, that would seem to allow the advantages of a railroad to be set off against the damages sustained by appropriations of land; most, or all, of these cases, are founded upon some express statutory provision, and follow the statute, in preference to the constitutional provisions.

There are other cases which seem to follow the same doc-
trine, in relation to assessments for the improvement of
streets in cities.  These cases are properly an exercise of
the taxing power, not the right of eminent domain.  The
act under which this proceeding is had, makes no provis-
ion, allowing a set-off of benefit against damages, but requires
all damages to be paid,  This statute must be strictly con-
strued against the company, as grantee from the state, and
liberally in favor of the respondent.

The constitution, the statute, and public policy, require
the rule to be established, rejecting the allowance of sup-
posed future advantages, as a set-off against the value of
property taken.  It is certain and easy of application.  It is
the only rule that will effectually shield the citizen from a
dangerous exercise of an extraordinary power, in depriving
him of his property.  Constitution, art. 1, § 18; 4 Comst.
420; Am. Railway Cases, 58; 1 Ib. 552; 4 Chandler, 72;
4 Ib. 88; *Woodfolk* v. *N. & C. R. R. Co.*, 1 Am. Law Reg.
550; Smith's Com. § 318; *The Albany N. R. R. Co.* v.
*Lansing*, 16 Barbour, 68; 19 Barbour, 171.

The court did not err, in allowing the respondent to open
and close.  1 Am. Railway Cases, 450; 16 Barb. 68.

The opinion of witnesses was properly received.  1 Am.
Railway Cases, 434.

IsBELL, J.—This case involves the question, what is the
true measure of damage where land is taken for railway
purposes ?   In the case of *Sater* v. *The Burlington and Mount
Pleasant Plank Road Company*, 1 Iowa, 386, the principle at
the foundation of this suit, was considered.  But little argu-
ment was had in that case, and a petition for rehearing is
now pending; it will, therefore, be proper to review the
ground there taken.

No question is made in the case before us, on the right of
the state to authorize the taking of land for public use, by
railway companies.  The objections to the ruling of the Dis-
trict Court, in the admission of testimony, to the instructions
given and refused, and to refusing to grant a new trial, are

in argument, all brought to bear on one point, viz : whether the court adopted a true basis of estimation of damage or compensation for the property taken.

The proceeding was had in pursuance of chap. 31, of Session Laws of 1853, entitled an act granting to railroad companies the right of way. By this act, it is made the duty of the commissioners appointed by the sheriff, " to inspect said real estate, and assess the damages which said owner will sustain by the appropriation of his land, for the use of said railroad corporation." The counsel have dwelt somewhat on the meaning of the word damages. Although this word may equally apply in various cases, where different *measures* of damage may be allowed, and is subject to various qualifications, as exemplary, compensatory, nominal, and the like; yet in the connection here used, we have no doubt it has relation to the provision of the constitution under which the property may be taken (art. 1, § 18), and is *precisely synonymous* with the phrase "just compensation," there used. That the language of the constitution means, that the person whose property is taken for public use, shall have a *fair equivalent in money*, for the injury done him by such taking; in other words, that he shall be made whole, so far as money is a measure of compensation, we are equally clear. This just compensation, should be precisely commensurate with the injury sustained, by having the property taken ; neither more nor less. 2 Greenl. Ev. § 253, and notes 1 and 2 ; Angell on Water Courses, 499 ; Smith's Com. on Const. 468, 470 ; Sedg. on Damages, 110, 112. So far there is no difficulty. But the moment we attempt to apply rules to the *ascertainment* of this equivalent—when we attempt to define what shall, and what shall not be taken into consideration in arriving at it—owing to the variety of circumstances attending such admeasurements, the subject becomes involved in difficulty. When we look into the adjudged cases, we find that courts of different states have adopted different rules to this end. Some of this difference, to be sure, is in consequence of the provisions peculiar to their constitutions, and statute laws; while we find others differing widely, where these do not oc-

casion the difference. Some attempt to enumerate with par-
ticularity, the various round of circumstances which shall
be taken into consideration in assessing damage; others lay
down general rules only, and refuse to disturb assessments,
where not clearly satisfied that the principles of such rules
have been violated.

It is highly desirable, that such a rule should be adopted,
as, while just, will be simple, and easy of application, and at
the same time be consonant with the established principles
of the common law. It is quite obvious that much of the
value of any rule on the subject, must consist, in the gener-
ality of its application and its simplicity. It should be equally
applicable in making assessments in the field, and in the
court room, on appeal. It is also quite obvious, however,
that any rule on the subject, must primarily have regard to
the extent of the interest appropriated to public use. Thus,
the first consideration of the commissioners is, what is to be
taken from A. and acquired by B. for public use? Is it the
fee of the land, or something less than the fee?

In one branch of the argument, stress has been laid on the
words of the statute, "appropriation of his land," as though
the statute contemplated the taking of the fee. But this
view is not warranted by the statute, when the whole is con-
strued together. To say nothing of the title of the act, the
proceeding to appraise, is had only where the owners shall
refuse to grant the right of way, and in the language of the
context, the company is "thereby authorized to construct and
maintain their railroad over and across said premises." It is
the right of way that is appropriated; not, however, simply,
the right of way, as that phrase is defined in the old books
of the common law, written before railways had an existence,
but as defined and regulated by statute. It is that right of
way peculiar to a railroad. It contemplates all that is neces-
sary and proper for the construction and maintenance of a
railroad over the premises. It is the right (within the limits
of quantity allowed by the statute to be taken) to all freedom
in locating, constructing, and conveniently using and repair-
ing the road and its appurtenances; and for such purpose

only, of taking, removing, and using any earth, gravel, stone, timber, or other materials, on or from the land so taken. And as such road is contemplated to be a level road, or nearly so, this right to construct, of consequence, contemplates the right to make deep cuts, or high embankments, as the topography of the land may require. And again : as the convenient use of such road contemplates rapid locomotion, the rights incident thereto, as against the owner of the fee, are incident to the appropriation.

The next question that will arise in the minds of the commissioners, is, what is the extent, in *duration*, of this right of way ? Does the company acquire an estate in perpetuity, or for a limited period ? The District Court evidently proceeded upon the idea, in the trial of this cause, that this right was limited to the life of the charter, or articles of incorporation. Is this so ? The statute granting the right of way, nowhere intimates such limitation. The only limit to the right of way of railroad companies, so far as our attention has been called, is found in section 776 of the Code, as consequent upon a non-user of the right. And in order to a restoration of the land, in that case, a refunding of the money paid for the right, without interest, is requisite. While section 681 of the Code permits the formation of companies to endure for fifty years only, and section 735 limits the licensing to that period, yet by the former section, such companies may be renewed by a compliance with the statute, for periods of fifty years, and nowhere is there any provision for a re-assessment of damage for the right of way, on a renewal of the charter. It is not certainly intended by the legislature, that such works shall cease, because their charter shall have expired. We therefore, conclude, that the right of way acquired by the company, is intended to be in perpetuity, if the company, its grantees, or assigns, continue to occupy the land for the purposes for which it was appropriated. But as this is a question not directly made in the case, but arising incidentally, and not having been argued, we refrain from pronouncing upon it too positively.

These are the rights which the company acquire on the

payment of the damages assessed.  They are conferred upon it by force of the statute, and the law will protect these rights:   That is to say, no action will lie in favor of the owner of the fee, for anything done on the part of the company, in the legitimate exercise of these rights.  *Mason* v. *Kennebec and Portland R. R. Co.*, 31 Maine, 215 ; *S. C.*, 1 Amer. Railway Cases, 162.  And see authorities cited in note, 1 Ib. 166.  On the other hand, the owner of the fee parts with no other or further right than the statute confers. The fee of the land remains in him, subject to the easement acquired.  The rights of the *company*, and those of the *owner in fee*, thus far, are as distinct and separate, and in legal contemplation, are each as independent of the other, as the rights of adjoining land owners in fee.  Any *reciprocal relation* that subsists between the parties, is either founded on agreement or statute law.  The only relation of this character, so far as we have been able to discover, which the commissioners should take notice of, is that created by section 16 of chapter 31, Sess. Laws, 1853, providing, that where a person owns land on both sides of the road, the corporation may be required to furnish a crossing.

But, in addition to this, it has been insisted on the one hand, that the company should fence their road ; and inasmuch as the statute does not compel it to do so, that the *price of fence* should be allowed in assessing damage ; and on the other, that the company is bound, at least, to build one-half the fence along the line of the road ; and therefore, this much at least ought not to be taken into account by the commissioners ; and that the company ought not to pay for fence, which they may be compelled to build.  Where no statutory regulation exists, defining the duties of railway companies as to fence, they are under no obligation to erect fences between their road and the adjoining land.  *Langlois* v. *The Buffalo and Rochester R. R. Co.*, 19 Barb. 396 ; *Perkins* v. *The Eastern R. R. Co.*, 29 Maine, 307, and authorities cited in note to 1 Amer. Railway Cases, 212 ; *Hurd* v. *R. & B. Railroad Co.*, 25 Vert. 116.

But appellant insists, that the statute regulating partition

fences (Code, chap. 52), is aplicable as between the owner of the fee, and a company having a right of way for a railway over it; and that although the right of such company may not be such as to clearly bring it within the meaning of the words "owners, occupant, or tenant," as used in that chapter, yet that the provision of section 909, applies to such occupants, and makes them amenable to the determinations of the fence viewers as to their duty in relation to fencing. That section, being a part of chapter 52, is as follows: "When any question arises between parties other than above stated, concerning their rights in fences, or their duties in relation to building, or supporting, or removing them, such question may be determined by the fence viewers, upon the principles of this chapter." This presents a point of some doubt, and one which we have endeavored to examine with much care. While the statute, at first view, would appear sufficiently broad to at least justify the construction contended for, yet on a careful review of the whole chapter, we fail to become satisfied that it was the intention of the legislature, to dispose of the whole subject of the duty to fence as between this special class of tenants, and the owner of the fee, thus summarily, without even an allusion to the subject of the right of way, or any of the various claimants of such right. It certainly was never the intention, that such a doctrine should apply as between the county and the individual over whose land a common highway might be laid. It would scarcely be claimed that it should extend to turnpike companies, or plank road companies, which are not held, even by those cases which go the greatest length, to be under any obligation to fence their roads. But it is insisted, that a railroad stands on a peculiar footing, different from either of these, as being deeply interested in having their road fenced. We cannot see, however, that such road stands on any such peculiar footing, different from turnpike roads or plank roads, that would justify us in extending the statute to include the one, and not the others. The better conclusion, we believe to be, that the chapter, from its whole tenor, was not intended to apply as between the owner

of the fee, and him holding simply the right of way over it.

But counsel for appellant go further, and say that, if a railroad company's right in the land, is not such as to bring it within the statute, in view of strict legal construction, yet equity, by analogy to the statute, will enforce the company to build one-half the fence, and, therefore, the commissioners should deduct from the damage, which would otherwise exist on this account. We are not prepared to hold on this point, to the *extent claimed*—that is to say, that any deduction should be made from the assessment of damage, on account of any equitable claim that may exist in favor of the owner of the fee against the company, to *build* fence. When one uses, and derives a benefit from, a fence actually erected by the other, then a different question would arise. In support of this view, however, counsel have cited a case so strongly in point, and from a chancellor of so high a character, that it will not do to pass over it in silence. We allude to *The Matter of the Rensselaer and Saratoga R. R. Co.*, 4 Paige, 553. That case, like the one before us, was an appeal from an assessment of damage on account of land being taken for railway purposes. There, as here, the statute relating to division fences, was not held to apply. Yet, the chancellor reduced an allowance for building fence one-half, on account of an equitable claim that the land owner would have upon the railroad company, to make and support one-half of the fence. Says WALWORTH, Chancellor in that case, "neither law nor equity will compel a turnpike company to build a fence from which it will derive no benefit." Again: "But a railroad has a deep interest in fencing against cattle, &c., from the adjoining lands, and comes within the equity of the statute." But not satisfied with this ground for his decision, he attempts to sustain it by reference to the principles of the civil law, but finally relies chiefly for his authority, on the case of *Campbell* v. *Mesier*, 4 Johns. Ch. 334, which was a case for contribution to reimburse the complainant for money expended in rebuilding a party-wall, already rebuilt by complainant, who had pre-

vious to rebuilding it, notified defendant to join with him in rebuilding the same. The wall, before taken down, was in a state of ruin and decay, and dangerous, and utterly incapable of being partly cut down; and KENT, Chancellor, allowed the claim, on the ground of common benefit. This case obviously stands on different equities from the one it is cited to support. It is not only much stronger in point of fact, in other particulars, but the complainant had already put defendant in possession of the benefit. Not so, where a deduction is made from the price of the right of way, on account of liability to fence. Although it may well be for the interest of a railway company to fence its road, it may, nevertheless, neglect that interest, and, as we have seen, is under no obligation to fence, unless required by statute. Whatever equitable right there may exist between the owner of the fee and that of the road, in case one uses and derives a benefit from a fence actually erected by the other, we think it will be high time to adjust such equities, when they actually come to exist. The language of the constitution is, that private property shall not be taken for public use, without just compensation. This has, at least, by all legislative construction, been held to mean, that making of compensation is a *condition precedent* to the taking. But we cannot learn that the case relied upon by counsel (4 Paige), has been adopted and followed by the courts of New York. See authorities cited in note, 1 Amer. Railway Cases, 212. But, however this may be in that state, we conclude that the radical error consists in the allowing pay for fence, *as fence*, at all. When we say this, we are not unmindful of the numerous decisions of other states, to the effect that the expense of fencing is a proper item to be included in damage for taking land for railway purposes, many of which have been cited by appellee. But when we say, that a party should not be allowed for fence *as fence*, in the assessment of damage, we by no means mean to be understood that, having his land *thrown open, and left in a manner unfenced*, is not to be considered; yet, as far as we have been enabled to discover, there is no reciprocal relation or obligation be-

tween the owner of the right of way and that of the fee, whereby either may compel the other to fence. If this is so, it follows that the *building of fence* is not necessarily, an element to be taken into the minds of the commissioners in assessing damage. And it should, therefore, be excluded, because it tends to mislead the mind in arriving at just compensation. As soon as it is determined that *fence* must be paid for, the questions arise, what kind of fence? and who is to keep it in repair? shall it be board, rail, or stone fence? shall the owner of the road keep it in repair, or shall the owner of the fee, or shall both share the burden? and so on, to utter confusion.

Again: in many instances, fence may not be needed. If the party owning the fee, does not desire to have his land inclosed; if it is in such locality that no fence is wanted, as is frequently the case in the immediate vicinity of a town, or in a remote district not yet settled, and entirely wild; a manifest inequity exists in compelling a company to pay for fencing. In many remote localities, the price of two lines of fence across a quarter section of land, would exceed the present value of the whole tract. And in many places on the prairie, if two such lines of fences were actually built, as furnishing one side of inclosures for large tracts, they would enhance the value of the land tenfold the actual damage by taking the right of way over it. We think it a good reason, then, for saying that the commissioners should not allow for *fence* as *fence*, that peradventure a fence may never be needed.

The case before us, as the evidence *tends* to show, and as insisted upon by counsel, furnishes a forcible illustration of this view. Here $592 has been allowed for fencing the road, or rather the residue of the land not taken, and the sum of $47.36, annually, for keeping the same in repair for forty-eight years, and an annual execution awarded to collect the same, while it is insisted that the land is in the immediate vicinity of a town, and will be required for town lots, and no fence ever be needed. If verdicts of this character may be entailed upon railway companies, all along the lines of

their roads, it requires no prophetic eye to see the discour-
aging effect they must have on such enterprises. The pol-
icy of the law is, that rights shall be certain, settled, sepa-
rate, and disentangled. No such mode of raising annuities
in perpetuity, can be countenanced.

The question recurs, what is just compensation for this
right of way, as defined by statute, in perpetuity, subject to
the relation only, that where a person owns land on both
sides of the road, the company may be required to furnish
a crossing? Money, in every commercial country, is the
standard measure of value of property. To apply this meas-
ure truly, in a given case, is the result of judgment, in view
of the state of the market. But there is no market value to
injury, although there may be to injured property. The
every day practice in measuring the extent of injury done
to property, is to regard its value before the injury, and
again after, and by the difference, learn the extent of the *in-
jury*. In many instances, no other mode is practicable. In
others, the circumstances going to make up the sum of the
injury, may be susceptible of being each measured, and in
such cases the extent of the injury may be arrived at by a
*direct* process. But this latter mode is seldom practicable,
except when distinct pieces of property are an entire loss.
To illustrate: if fifty sacks of wheat are set on fire, and
twenty rescued uninjured, and thirty burned, the value of
the thirty burned would be the extent of the injury; but
if all were affected in value by the fire, yet not rendered en-
tirely worthless, the difference between the prior and subse-
quent value, would alone determine the extent of the injury.
In the case of *Sater* v. *The B. & Mt. P. Plank Road Co.*, we con-
sidered the proper mode of arriving at the extent of the in-
jury to land, by taking the right of way over it, and con-
cluded that the more certain way of arriving at correct re-
sults, as well as the more easy way, was to regard the value
of the land entire, and then, in the condition it would be
immediately after the right was carved out, and learn the
value of the right of way, or rather the injury, by taking it
in this manner. We have seen no good reason for receding

from the ground then taken. We believe the legislature entertained a similar view, when it provided that these assessments should originally be made on *inspection of the premises;* and we believe, that where juries called on appeal, can have an actual view of the premises, to allow them to do so, will be attended with satisfactory results.

The case stands thus: While the owner of the land is compelled to stand passive, the sovereign power asserts its prerogative, and says to the company, you may pass over this man's land, and enjoy certain defined rights therein, for public use, and no more, provided you first make him compensation. Money is the common measure of value for this land, and the rights you are to acquire. This measure must be applied in the first instance, by the judgment of six commissioners on oath. The proper mode of applying this measure (see opinion of BRONSON, J., in *The Matter of Furman street,* 17 Wend. 649; *Troy & Boston Railroad Co.* v. *Lee,* 13 Barb. 169; *Canandaigua & Niagara Falls Railroad Co.* v. *Payne,* 16 Barb. 275), is, to determine the fair marketable value of the premises before the right is set apart, and then again after, and the difference will be the true measure of damage, and when paid, will be in a legal sense, just compensation. The money paid will make the party whole.

This is no chafferring contract. Prudential motives may induce the parties to accommodate themselves to one another, as to the time of taking possession and the like, but in the absence of any agreement, the whole matter is reduced in *time* to a point. The company may be presumed to be at hand with its money, to tender for the right of way, and its operative force to enter upon construction. The commissioners are on the ground; they ask themselves, what are these premises fairly worth to-day in the market? Again, what will they be worth to-day, after the owner shall have parted with the right which the company are about to acquire? The present values, taking into consideration the extent of the rights conferred, are those which are to be arrived at. The immediate and necessary consequences of parting with the right conferred, must of necessity enter into

the consideration of the commissioners. The premises, as left in the condition they will then be, together with the money paid, should be equal in value to the premises immediately before the taking. An enumeration of the various circumstances that may enter into any given case, tending to immediately depreciate the value of the premises, by taking the right of way over them, is impracticable. The most we are able to affirm, is, that all the circumstances that immediately depreciate the value of the premises by taking the right of way, are proper to be considered, and none others. Thus, in case the land was before fenced, and by taking the right of way, it is thrown open and left in a manner unfenced, this fact will enter into the consideration, in arriving at the depreciated value of the remaining premises. But it will not do to say, the proprietor will have to fence his land; therefore, he should be allowed some definite price for some particular kind of fence, as a distinct consideration from the depreciation in value of the premises. Much less will it do to say, the consequence of building extra fence, will be to have to keep it in repair, and therefore, a further distinct consideration should be allowed for this. But the sole ultimate consideration is, how is the taking of the right of way to affect these premises to-day in the market? How the road may affect the value of the land, if completed, or any other consideration of future benefit, has nothing to do with the assessment. Neither has any abuse of the privilege, or probability of abuse; for the company only bargained for the legitimate use, and if it goes beyond this, it will render itself liable, when the act is done, and and not until then. Neither is any unwillingness on the part of the owner to allow the road to go over his land, in any manner to affect the assessment. There is a tacit condition attached to the title by which every individual holds his land, that in case it shall be required for public use, it may be taken for its simple value in the market. Or, if a part only is required, for so much as the taking of this part, will affect the value of the premises in the market.

Henry v. The Dubuque and Pacific R. R. Co.

These considerations will, at once, dispose of all questions of speculative and merely fancy damages.

Believing, as we do, that the court erred in refusing the fifth instruction asked by the company, and consequently in refusing a new trial, the judgment must be reversed. We have not attempted, neither shall we attempt, to review specifically all of the questions made in the cause. But in reference to the admission of testimony, we would remark, that questions were presented in the case of *Sater v. The B. & Mt. P. Plank Road Co.*, which lead to an investigation of the proper mode of bringing the evidence of damage before a jury, called on appeal, where no actual view of the premises can be had by such jury. We then concluded, that it would avoid much of the probability of error, whereby litigation *might* be prolonged, which should always be carefully guarded against, where powerful companies and individuals come in conflict, to permit the witnesses called by the respective parties, on their examination in chief, to speak as to their *opinion* of the *value* of the premises *before and after the taking of the right of way*, leaving the opposite party to the right of cross-examination, to learn the ability of the witness to judge in the premises, and what he takes into consideration in making up his judgment. Although evidence of mere opinion is always unsatisfactory, yet in determining value, that it has to be admitted, from the necessity of the case, is a proposition too well established, to require authority or argument to prove. But these opinions must be confined to the premises over which the right of way is taken. See opinion of DEROY, J., in *Wyman v. Lexington R. R. Co.*, 13 Metc. 316.

Judgment reversed.