DETERMINED IN THE

# FIRST DEPARTMENT

AT

# GENERAL TERM,

### April, 1894.

---

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* THE SAINT NICHOLAS BANK, Defendant.

HUGH J. GRANT, as Temporary Receiver, Appellant, In re Petition of LEVI C. LATHROP and Others, Appellants.

*Relation between a bank and its depositor — effect of the certification of a check — title to a deposit — rescinding a contract for fraud — knowledge by a bank's officers of its insolvency — debts of a bank exceeding its assets — special deposit, how proven — trust fund to pay a check — Clearing House, functions thereof — temporary receiver — jurisdiction of General Term to give instructions — right of appeal under section 1294 of the Code of Civil Procedure.*

When checks are deposited in a bank in the ordinary course of business and credit is given therefor upon the pass book of the depositor, the relation of debtor and creditor arises with regard to the sum so credited.

The legal effect of certifying a check is to transfer the obligation of payment to the bank certifying the same, which, without regard to the state of the depositor's account, becomes a debtor to the holder of the check, and its debt to the depositor is correspondingly reduced.

Upon a deposit being made by a customer in a bank in the ordinary course of business, of money or of drafts or checks received and credited as money, the title to the money or to the drafts or checks is immediately vested in and becomes the property of the bank.

One who has been induced to part with his property by the fraud of another, under the guise of a contract, may, upon discovery of the fraud, rescind the contract and reclaim the property, unless it has come to the possession of a *bona fide* holder.

From the circumstance that the Superintendent of Banks properly closed a certain bank on a certain day, no inference can be drawn of knowledge on the part of the officers thereof of the bankrupt condition of the institution which would make it a fraud for them to receive deposits.

A general allegation that the debts and liabilities of a bank exceeded the total amount of its assets and the value of its property by over $150,000 (taking into account the fact that its capital stock was $500,000), would mean simply that there was an impairment of its capital stock to the extent mentioned, still leaving a surplus of $350,000 over and above what it owed to its depositors.

To prove that deposits were special, so as to create a trust or an appropriation as between the parties, requires no further evidence than that the intention and desire were communicated by the depositor to the bank, and that the latter agreed, or is estopped from denying that it agreed, to so apply the deposits; and when a trust or special deposit is found, upon facts legally sufficient to authorize the finding, then the contract is established and effect must be given to it.

Unless, by an arrangement between a bank and its depositor, there is a setting apart or appropriating of particular property or a fund for a particular purpose, no trust is created as between them, their ordinary relation being that of debtor and creditor, it being necessary to constitute a trust that there should be a specific appropriation of a particular fund for the payment of a particular claim.

By the certification of a check, or the issuance of a certificate of deposit, a bank becomes the debtor to the holder of such check, and is not obliged to set apart any portion of its assets as a particular fund to pay the same.

The transaction of making a deposit, drawing checks and having some of them certified, is not of itself, and irrespective of any other transactions, considerations or agreements, a contract, the effect of which is to take the moneys represented by the certified checks out of the general property of the bank, as well as out of the account of the depositor, nor under any principle of the law merchant can such a transfer operate as an assignment of the deposits to the payees of the certified checks; there is no special or trust relation created thereby between the parties as the result of the deposit and the drawing of the checks, certified or uncertified.

An ordinary uncertified check upon a general account is neither a legal nor an equitable assignment of any part of the sum standing to the credit of the depositor, and confers no right upon the payee that he can enforce against the bank.

A clearing house furnishes but a convenient method to banks of making their collections and payments as between each other, and an outsider, not a member thereof, is not to be benefited or injured by the action of such banks as between themselves. The knowledge of such usage which a depositor must have is that banks use the Clearing House as a convenient method of making their own collections and their own payments, and that they do not send the deposits of one day against the checks of the same day, nor do they send specific funds to meet specific certifications. They simply send all their checks, drafts and obligations of every kind, and offset against the same all other checks and other obligations of any kind at any time issued by them, or properly drawn on them, and which may happen to be presented at a specified date.

The relation between a bank and the payees of checks drawn thereon is controlled by settled principles of law, and the customs prevailing in the Clearing House can in no way alter or modify the law merchant in regard to checks or commercial paper. Its usages and rules may bind its members in the same way that a general usage of trade may bind those who deal with reference to it, but those who are not bound by such usages, and have not contracted with reference to them, have no right to avail themselves of them to create an obligation against those who are parties to their adoption and bound by them *inter sese* only.

The sending of checks through the Clearing House on a certain day for collection, does not effect an appropriation of such checks as a specified fund for the payment of checks, certified or uncertified, drawn by the bank's customers on the previous day ; such checks are sent for the purpose of collection, and not of appropriation.

A temporary receiver, as an officer of the court, has a right, pursuant to the provisions of the Code of Civil Procedure, to apply from time to time to the court for instructions, and its discretion, which is vested in the Special Term, can also be exercised by the General Term upon an appeal to it by such receiver.

Where creditors of an institution, and not its temporary receiver, apply for summary relief, and it is granted, notwithstanding the opposition of the receiver and the interests which he represents, such receiver is, within the meaning of section 1294 of the Code of Civil Procedure, a party aggrieved, and has the right of appeal to the General Term. (VAN BRUNT, P. J., dissenting.)

CROSS-APPEALS by Hugh J. Grant, as temporary receiver of the St. Nicholas Bank, and Levi C. Lathrop and others, petitioners, from an order made at the New York Special Term, and entered in the office of the clerk of the county of New York on the 14th day of February, 1894, directing the said receiver to pay to Levi C. Lathrop and others the sum of $74,741.80, denying the prayer of the petitioners in all other respects, and vacating an order entered in said clerk's office on the 5th day of February, 1894.

The petition upon which the order is founded recites that the petitioners, who are bankers and brokers, for some years had an account with the St. Nicholas Bank, and that on the morning of December 20, 1893, they had on deposit to their credit in such bank $279,255.32; that on that day they delivered to the bank in checks for deposit to the credit of their account the sum of $86,324.46, and on the same day drew for presentation to said bank, for payment or certification, checks to the amount of $86,200.80, the certified checks alone amounting to $74,741.80.

That the St. Nicholas Bank did not open its doors for business on the 21st day of December, 1893, though it sent to the Clearing House for collection all the checks deposited by the petitioners; and the checks drawn against the deposits of the petitioners, including those certified and uncertified, were sent by the holders thereof through their banks to the Clearing House, the intent being on the part of the St. Nicholas Bank, and of the other banks holding checks of the petitioners, that the checks deposited by the other several banks should be paid by the checks belonging to the petitioners, drawn by other parties on other banks and delivered by petitioners to the St. Nicholas Bank, and by that bank to the Clearing House, for that specific purpose, the effect of which would and should have been a mutual exchange, satisfaction and settlement of obligations.

That is, the checks would have been cleared, and the checks drawn by the petitioners on said bank, to the order of other parties and deposited by them in their various banks for collection, would have been paid by the checks of still other parties, to the order of the petitioners, which the St. Nicholas Bank had sent to the Clearing House for that purpose before the Superintendent of Banks had closed the doors and taken possession of said bank.

The petitioners allege that the checks referred to were their property, delivered to the bank in trust for the specific performance of the above trust.

But the petitioners show that, instead of such exchanges, satisfaction and settlement of said respective classes of checks being permitted, as the petitioners are informed and believe, an individual member of the Clearing House, without law or right or the authority of his associates, at the time wrongfully interposed and prevented the performance of said act and trust, and took and received said checks from the Clearing House in the Gallatin National Bank, in trust for the Superintendent of Banks, and, as the petitioners are informed and believe, has delivered the checks to the temporary receiver of said bank, without the authority or consent of petitioners, and against their written protest, to the Gallatin National Bank, forbidding it to so deliver said checks, and requiring it to hold and apply said checks for the specific purpose for which they were so deposited.

The petitioners further show that the Clearing House thus wrong-

fully refused to effect the exchanges of the said the St. Nicholas Bank on that day, which exchanges the petitioners are informed and believe showed a credit in favor of said bank in the sum of over $50,000, and that the bank was wrongfully closed on the morning of December 21, 1893, pending examination, and forbidden to transact business by order of Charles M. Preston, Superintendent of Banks, of which action neither any officer of said bank nor any of the petitioners had notice beforehand.

The checks that were certified as above are all now in possession of the petitioners. They either retained the possession of all such checks, or took them up for full value, from the persons to whom they had delivered them.

The affidavit in support of this petition states " that neither said examiner nor said Superintendent of Banks at any time announced to the public, or to any depositor, shareholder, director, officer or employee of said bank, his purpose at any time preceding the 21st day of December, 1893, of closing said bank, nor did either said examiner or superintendent announce to any such person, or to deponent or deponent's firm, that he would close said bank before the morning of December 21, 1893, or that the capital of said bank was in any way supposed or alleged to be impaired, or of any other condition of said bank other than that of entire solvency, and that the bank would resume and continue business on the 21st day of December, 1893, and thereafter uninterruptedly as it had hitherto done and in the usual course of business." That, misled by such conduct and silence on the part of the Superintendent of Banks and the examiner, the petitioners made the large deposits of money stated.

By the answering affidavit it is shown that $478,725.88, consisting of all the checks, drafts and notes which the St. Nicholas Bank had on hand, were sent in the usual course of business to the Clearing House for collection ; that deposits were received on the 20th by the bank, and checks certified in the same manner as it had been the custom to do ever since the organization of the bank.

The relief asked was, that all deposits of checks made by the petitioners on December 20th, or the proceeds thereof, be returned, or that the receiver be directed to pay checks, certified and uncertified, which had been drawn by the petitioners on said day. Relief was accorded to the extent of directing that the receiver pay the

amount of checks certified on the 20th, and which were presented to the Clearing House on the 21st, and denied as to the uncertified checks.

From such denial the petitioners appeal, and from so much of the order as directs payment of the amount of certified checks the receiver appeals.

*John M. Bowers*, for the receiver.

*Frank J. Mather*, for the petitioners.

O'BRIEN, J.:

The respondents claim that, upon the facts, the bank derived no legal title to any of the deposits of December 20, 1893, and that neither the checks nor their proceeds ever became the property of the bank. We think the reasoning in the opinion of the court below disposes of this contention. As therein said:

" There can be no doubt that the checks deposited by the petitioners on the 20th day of December, 1893, became the property of the bank. Credit was given therefor in the petitioners' pass book, and thereupon the relation of debtor and creditor arose with regard to the sum so credited. Nor can there be any doubt as to the relation of the parties with regard to certifications made by the bank upon the same day. The legal effect of such certifications was to transfer the obligation of payment to the bank. The latter then became debtor to the holders of the checks, and its debt to the depositors was correspondingly reduced. It is true that these certifications created a legal obligation upon the part of the bank without regard to the state of the depositors' account."

This is a correct statement of the legal relations of the parties, and there is nothing in the case referred to by respondents of *Cragie* v. *Hadley* (99 N. Y. 131) which in any way destroys its accuracy. In that case, as shown by the opinion, the drafts, for the proceeds of which the action was brought, were deposited with the bank between two and three o'clock in the afternoon of April 13, 1882, and were credited in the plaintiff's pass book and on the books of the bank to their account. " The bank closed its doors at the usual hour on that day and never opened them afterward. It turned out that the bank was irretrievably insolvent, owing debts to the amount of one mil-

lion three hundred thousand dollars, with assets not exceeding in value forty per cent of its debts, and had been so insolvent for months before its failure," of which fact the president had full knowledge, and presumably its other officers and agents. Upon these facts, and while recognizing the general doctrine " that upon a deposit being made by a customer in a bank, in the ordinary course of business, of money or of drafts or checks received and credited as money, the title to the money or to the drafts or checks is immediately vested in and becomes the property of the bank," the opinion says : " The further rule that one who has been induced to part with his property by the fraud of another, under the guise of a contract, may, upon discovery of the fraud, rescind the contract and reclaim the property, unless it has come to the possession of a *bona fide* holder, is equally well settled." And upon the ground of fraud on the part of the bank in receiving, under the circumstances, the deposit, it was held that the depositor was entitled to rescind the contract which was implied from the deposit, and to reclaim the property which the bank had obtained by fraud.

Here not a single fact is presented to support the charge of insolvency, or to show that the officers had knowledge that the bank was insolvent, the only fact in this connection being that the Superintendent of Banks closed this bank on the morning of the 20th of December, 1893. While such action of the superintendent may have been perfectly proper, from this circumstance no inference can be drawn of knowledge of the bankrupt condition of the institution on the part of the officers, which would make it a fraud for them to receive the deposits. And the case relied upon of *Cragie* v. *Hadley* (*supra*), (as well as other cases that might be cited, wherein the reclamation of checks or drafts deposited shortly prior to the failure of a banking situation had been sustained) is placed on the ground of fraud on the part of the bank in receiving deposits after its insolvency was known to its officers. It may transpire that on December 20th this bank had sufficient assets to meet its deposits, and that there was merely an impairment of capital, which, while requiring the intervention of the State and the initiation of proceedings to wind up the bank, would not necessarily constitute the kind of fraud which the courts say justifies the reclamation of deposits. A general allegation that the debts and liabilities of the

defendant exceed the total amount of the assets and the value of all its property by over $150,000 (taking into account the fact that its capital stock was $500,000) would mean simply that there was an impairment of its capital stock to the extent mentioned, still leaving a surplus of $350,000 over and above what it owed to its depositors. The condition of the bank, whether solvent or not, is as yet undetermined, the present receiver being but a temporary one, and the final judgment not having as yet been entered. That no fraud was attempted is apparent from the conduct of the bank and its officers in having made provision to meet all the checks which were presented on the 21st to the Clearing House in the ordinary course of its business, and without having up to that time been guilty of any act indicative of open or covert insolvency.

What facts must appear to justify a reclamation of a deposit when once made has been many times stated. Thus, *St. Louis & San Francisco R. R. Co.* v. *Johnston* (133 U. S. 566, head note) states : " When a bank has become hopelessly insolvent, and its president knows that it is so, it is a fraud to receive deposits of checks from an innocent depositor, ignorant of its condition, and he can reclaim them or their proceeds."

The court below, as shown by the opinion, did not base its order upon this theory, but thought that the strict legal relations of the parties were affected by a custom in regard to clearances, by force of which " there was an appropriation of these checks [of depositors sent by the bank to the Clearing House] to the payment of their obligations maturing that day and payable through the Clearing House. The checks and the certifications were to offset each other ; " and that by this act of appropriation the creditor obtained an equitable right to the application of the property, which was not to be affected by the failure of the Clearing House to apply them as intended.

In this we think the learned judge fell into two errors, one, in basing the right of recovery upon the theory of the misconduct of the agent ; and again, in assuming a custom of which there is no evidence in the papers and of which we think there is no existence in fact. If the right to an equitable lien or preference is to be accorded the petitioners here, it cannot, for obvious reasons, be put upon the ground of agency, but must, under well-settled equitable

principles, be based upon the theory of a trust. If the checks which the bank received from its depositors on December 20th and sent to the Clearing House on the 21st, constituted a trust fund for the purpose of meeting the checks certified on the 20th, then the receiver, standing in all respects in the bank's stead, would have the same duty and obligation of carrying out the trust — a duty which equity could compel him to perform.

That deposits may be special, so as to create a trust or an appropriation as between the parties, is evident. To prove that requires no more than evidence that the intention and desire were communicated by the depositor to the bank, and that the latter agreed, or is estopped from denying that it agreed, to so apply the deposits. When the trust or special deposit is found upon facts sufficient legally to authorize the finding, then the contract is established and effect must be given to it. Upon such an inquiry, as said in *Straus* v. *Tradesmen's Nat. Bank* (122 N. Y. 382): " The question [is] whether the Tradesmen's Bank was entitled to retain from the fund [claimed to be a special deposit] the amount so due it from Dixon [a depositor]. This was dependent upon the nature of the credit to Dixon, and the character in which the bank was at liberty to assume that the deposit furnishing the credit was made. As a rule, a deposit made in a bank by a person on general account becomes its fund, and the relation between the depositor and the bank is that of debtor and creditor, and, in the absence of any agreement to the contrary, the bank is at liberty to apply the money upon a demand due to it from the depositor."

In *People* v. *City Bank of Rochester* (96 N. Y. 32) a note was outstanding, and petitioners, wishing to anticipate payment on a certain day, informed the bank in regard to the note, and then gave and the bank received their check for the amount of the note, less rebate of interest, in these words:

" Pay to our note, due January 6th, 1883, or bearer, two thousand, nine hundred and sixty-three $\frac{25}{100}$ dollars.

" SARTWELL, HOUGH & FORD."

DANFORTH, J., writing the opinion therein, says: " The transaction in question was not between the bank and Sartwell, Hough & Ford (petitioners), in their relation of debtor and creditor, nor in

their relation of bank and depositor. The object of the latter was to provide a fund for the payment of specific notes, and the engagement of the former was to apply that fund to such payment. * * * (*Libby* v. *Hopkins*, 104 U. S. 303; *In re Le Blanc*, 14 Hun, 8; 75 N. Y. 598.) These cases stand upon the ground of a specific appropriation of a particular fund for the payment of the claim there brought in question. So does the one at bar.

, That fact is lacking in the case of *People* v. *Merchants & Mechanics' Bank* (78 N. Y. 269). * * * The checks of petitioners were money assets in the hands of the bank, and were so treated by all parties; they were delivered to it with explicit directions to apply the proceeds on payment of the notes; those directions were assented to by the bank officer. * * * It assumed a duty, and the receiver, as its representative, is bound by it. * * * The checks were impressed with a trust."

In addition to these cases many others could be cited wherein the distinction is clearly pointed out, that, unless by an agreement between the parties there is a setting apart or appropriating of particular property, or a fund for a particular purpose, no trust is present as between a bank and its depositors, the ordinary relation between whom is that of debtor and creditor, it being necessary to constitute a trust that there should be a specific appropriation of a particular fund for the payment of a particular claim. (*Libby* v. *Hopkins*, 104 U. S. 303; *People* v. *Merch. & Mechanics' Bank of Troy*, 78 N. Y. 269; *Cavin* v. *Gleason*, 105 id. 256.)

That there was a special appropriation by express arrangement or agreement of the parties is not claimed, but, as we understand, it is insisted that by force of the custom governing clearances as bearing upon the payment of certified checks, there was created an appropriation of deposits made on the 20th and sent to the Clearing House on the 21st for the specific purpose of paying the certified checks of the 20th. We are no longer speaking of the right to a return of the deposits, but of the right of a holder of a check, certified on the 20th, to claim an appropriation or setting aside of a specific fund by the bank, out of which he is equitably entitled to a preference.

As said in *Cook* v. *State Nat. Bank of Boston* (52 N. Y. 114):

" The certification of a check, if written out, would contain a statement that the drawer had funds sufficient to meet it in the bank, applicable to its payment, and an agreement on behalf of the bank that these funds should be retained and paid upon the check whenever it was presented."   And as said by RAPALLO, J., in speaking of the nature of the contract that a bank makes on certifying checks (*Thomson* v. *Bank of B. N. A.*, 82 N. Y. 6): " The bank has given a negotiable obligation to the holder of the check which is equivalent to a certificate of deposit.   If the holder of the certified check should lose it, he would still have his remedy upon it against the bank, but could not have recourse against the drawer, whose funds had thus been locked up or transferred to the credit of another party."

The contract, therefore, that a bank makes when it certifies a check is in effect an acceptance.   There is no trust relationship between such bank and the holder of the check, nor is the bank bound to set apart from its other funds a particular sum for its payment.   (*First Nat. Bank* v. *Leach*, 52 N. Y. 350 ; *Lynch* v. *First Nat. Bank of Jersey City*, 107 id. 179 ; *Goshen Nat. Bank* v. *Bingham*, 118 id. 349.)   These cases are authority for the proposition that by the certification of a check or the issuance of a certificate of deposit a bank becomes debtor to the holder of such check, and is not obliged to set apart any portion of its assets as a particular fund to pay such check.

The petitioners here, not claiming to have made a deposit of checks on the 20th as a special fund to pay the checks, certified or uncertified, drawn on that day, but having, in the usual and ordinary way, made a deposit, and having drawn checks, some of which were certified and some not, it cannot be said that the latter were certified or drawn against the amount deposited on that day, because such statement is unsupported by any facts.   Nor do we think the transaction of making the deposit, drawing checks, and having some of them certified, of itself and irrespective of any other transactions, considerations or agreements, was a contract, the effect of which was to take the moneys represented by the checks so certified out of the property of the bank as well as of the depositor, or that under any principle of the law merchant such a transfer can

operate as an assignment over of the deposits to the payees of the certified checks.   On the contrary, there was no special or trust relation, upon the facts appearing, created between the parties as the result of the deposit and the drawing of the checks, certified or uncertified, because, as between the bank and the payees of the certified checks, the relation was that of debtor and creditor; and, as said in *O'Connor* v. *Mechanics' Bank* (124 N. Y. 331) respecting " an ordinary uncertified check upon a general account," it " is neither a legal nor an equitable assignment of any part of the sum standing to the credit of the depositor, and confers no right upon the payee that he can enforce against the bank." ·

In the case of *Attorney-General* v. *Continental Life Ins. Co.* (71 N. Y. 325), where, from the circumstances under which the check was issued, it was claimed that the intent was to transfer and assign to the holder a like amount of the fund on deposit in a trust company, it was said:

" The petitioner was a creditor of the insurance company upon a claim upon a life policy.   When she received the check she was a creditor still, the claim not having been paid, but only liquidated. When the company failed and went into the hands of a receiver, the rights of all the creditors to all the assets became fixed by statute, and the petitioner, not having acquired any lien upon any of the assets, occupies the position of a general creditor.   The necessary delay in transmitting the check for her indorsement, and in returning it, was unfortunate, because, in the meantime, the statute had seized the assets and provided for their distribution among all the creditors, and both precedent and reason have clearly defined and well established the general rule to be applied, and courts ought not to depart from it to meet a particular case of supposed hardship."

So, we can say here, the act of the Clearing House, or one of its officers, in not making the clearance, was unfortunate, because before the mistake could be rectified the receiver took possession of the assets under the statute, for all the creditors, and no legal or equitable right to a preference in payment being made out, the general rule firmly established should be adhered to, which secures equality of payment among creditors.

This brings us finally to a consideration of the effect upon the relations between the parties of the transmission of checks, etc., by the

bank to the Clearing House, and of the relation which the holders of checks, certified or uncertified, bear to the Clearing House.

That the Clearing House furnishes but a convenient method to banks of making their collections and payments as between each other, and that an outsider, not a member thereof, is not to be benefited or injured by the action of such banks as between themselves, becomes evident, we think, upon reflection.

As clearly stated by the appellant, the precise nature of the transactions of the Clearing House are these : Take the case of the intended action of the St. Nicholas Bank on the morning of the 21st day of December, 1893. It sent to the Clearing House all checks, drafts and other obligations held by it on other members of such Clearing House. These checks were accompanied by a statement headed "Saint Nicholas Bank, Settling Clerk's Statement, Dec. 21, 1893." It contained a list of the different banks, members of the Clearing House, by their numbers; opposite such numbers were the names of the banks, and still opposite the names of the banks was the entire amount of all checks drawn on such particular bank. Then all the checks held by the other banks, members of the Clearing House Association, on the St. Nicholas Bank, are presented to it at its desk in the Clearing House, and are footed up by its settling clerk. On the balance being thus fixed, if a debit balance, the St. Nicholas Bank pays the same *in cash;* if a credit bank, it receives the same *in cash.* All that the Clearing House does is to distribute these payments for differences. The liability of the Clearing House, if any, does not commence till these differences are settled by the banks. The St. Nicholas Bank, however, on the morning of the 21st day of December, 1893, was bound to offset, as against its claims on the other banks, just as much by checks certified by or drawn by it days, weeks or months previous, as by checks certified by it or checks drawn on it the day previous. It is impossible to incorporate into this Clearing House business any custom which inures to the benefit of a depositor and permits a general belief that his certifications will be paid by the bank remitting his deposits to the Clearing House the next morning for the express purpose of meeting such certified checks. It is also impossible to incorporate into the business of such Clearing House any custom on which a

depositor can rely that his deposits will be remitted to meet in the Clearing House the next morning all such checks as he may draw against them, whether certified or uncertified. The precise custom and the precise knowledge that the depositor must have is that the banks use the Clearing House as a convenient method of making their own collections and their own payments, and that they do not send the deposits of one day against the checks of the same day. Nor do they send specific funds to meet specific certifications. That in simple truth they send in all their checks, drafts and obligations of every kind and offset against the same all other checks and other obligations of any kind at any time issued by them or properly drawn on them, and which may happen to be presented at a specified date.

Had there been no Clearing House, the St. Nicholas Bank would have collected from each of the banks on whom checks received by it were drawn, by sending to such banks and demanding payment thereof, and would likewise have paid on demand all other banks who held checks drawn on it, whether certified or uncertified. Doubtless the St. Nicholas Bank would have effected the exchanges itself with each of the other banks by simply paying from day to day the difference between checks held by the respective banks. If, for the convenience of these banks, they all meet at a certain place and hour and make payments and agree upon offsets, it certainly makes no change in the legal status of the transaction and does not carry rights to depositors not otherwise belonging to them.

The entire amount that was collected by the Superintendent of Banks and turned over to the temporary receiver, upon the checks that were sent by the St. Nicholas Bank to the Clearing House on the morning of the 21st day of December, 1893, was the sum of $412,928.79 Why should this be used up in favor of the certified checks that went through the Clearing House that morning alone? Why should it not be applied with just as much force to certified checks of the 19th of December, 1893, or certified checks of the 9th of December, 1893, or certified checks of any other date that happened to go into the Clearing House that morning? Why should it not be just as much applied to uncertified checks? Why, in short, if the court should give any preference in the matter, should not that preference be directed to carrying through the transaction that

would have taken place at the Clearing House on that morning had the St. Nicholas Bank been in a position to carry on its ordinary business?

In the not improbable case that the checks and drafts that were presented against the St. Nicholas Bank in the Clearing House on the 21st day of December, 1893, exceeded the checks and drafts it sent there, how will the court discriminate as to which of the holders of such checks shall be paid? In short, the moment that the supposed equity created by the assumed custom is permitted, the temporary receiver and the court find themselves surrounded by a maze of difficulties, the end of which cannot be foreseen.

But whatever the custom or manner of dealing between the several banks and the Clearing House, how can this be said to affect the relations of a particular bank to the payees of checks certified by it, or uncertified and drawn upon it? The relation between the bank and such payees is one controlled by settled principles of law. It can matter little to the latter what customs prevailed in the Clearing House, nor are they in any way interested whether the bank against which the certified checks held by them are drawn makes its settlements through the Clearing House or by messengers sent around to each bank. As said in *Overman* v. *Hoboken City Bank* (1 Vroom, 61) : Where there is no claim [that the association called the " clearing house " is an institution authorized by special legislation, or any authority existing in such association, in any way, to alter or modify the law merchant in regard to checks or commercial paper, such association cannot be held to have power to make usages or rules to bind those who are not parties to its organization. Its usages and rules, if not in conflict with law, may, by the implication of tacit adoption in the contracts of members, bind them in the same way that a general usage of trade may bind those who deal with reference to it, and who are, therefore, held impliedly to adopt it. But those who are not bound by such usages, and have not contracted with reference to them, have no right to avail themselves of them to create an obligation against those who are parties to their adoption and bound by them *inter sese* only]. And we agree with what was said in *Merchants' Bank* v. *Bank of the Commonwealth* (139 Mass. 518): " To the regulations of this association the customers of the banks are not parties, and whatsoever effect is

to be given to them as between the banks, their customers are not in a situation to claim the benefit of them, nor are they liable to be injuriously affected by them."

The sending, therefore, as a matter of convenience, of checks through the Clearing House on a certain day for collection, does not, by any custom known to us or established by the moving papers, effect an appropriation of such checks as a specific fund for the payment of checks, certified or uncertified, drawn by the bank's customers on the bank's customers on the previous day. And that checks so sent are for the purpose of collection, and not of appropriation, becomes evident when we remember that it is entirely proper and right, if more convenient, for the bank to make its own collections of such checks outside the Clearing House and through its own agents.

We have considered this subject as though the determination had been reached in an action after a trial, and the discussion into which we have been drawn, and the difference between the views which we entertain and those held by the learned court below, as to the custom prevailing among banks dealing with the Clearing House, will show, as was held in *The Matter of the North River Bank* (60 Hun, 91), that "the practice of deciding such claims upon summary applications is to be discouraged, and the claimant should ordinarily be remitted to his action at law."

Considering the amount of money here involved, the facts upon which the right to the relief was based, the absence of any authoritative decision upon the question, and the condition of the receivership, we think it would have been a proper case for the court to refuse to entertain a summary application and remit the claimants to their remedy by action. But that the court had the right and power to entertain the application was decided at the last term in the case of *People* v. *St. Nicholas Bank, In re Kurzman* (76 Hun, 522). It was therein held that a temporary receiver, as an officer of the court, had a right, pursuant to the provisions of the Code of Civil Procedure, to apply from time to time to the court for instructions. In referring in that decision to the court, we meant, not simply the Special Term, nor any other branch, but the entire court, made up of its various branches, including the General Term. It having been held, therefore, that the receiver, as an

officer of the court, has a right to apply to the court for instructions, the discretion which is vested in the Special Term can also be exercised by the General Term upon the receiver taking an appeal. Whether he would be justified in taking an appeal to the Court of Appeals is a question for that court. In this case it was not the receiver applying to the court for instructions, but depositors who have brought the receiver into court to obtain a direction that he pay a large sum to such claimants out of the moneys in his hands. Under such circumstances, where the claimants, and not the receiver, apply for summary relief, and this is granted, notwithstanding the opposition of the receiver and the interests which he represents, we fail to see why the receiver is not, within the meaning of section 1294 of the Code, a party aggrieved, and thus having the right to appeal to the General Term.

To recapitulate, we think, upon the undisputed facts, that the application should have been in all respects denied, for the reasons:

(1) That upon the petitioners having made a deposit it became the property of the bank, and no fraud having been shown, such deposit was not subject to reclamation.

(2) That as there was no agreement or arrangement, express or implied, that such deposit should be specifically appropriated or applied to the payment of any particular check or claim, there was no trust relation created between the parties.

(3) That with respect to certified checks, the payees thereof acquired no special lien upon or equitable assignment of any special fund or particular portion of the assets of the bank.

(4) That any portion of the deposits of December 20, 1893, which became the property of the bank, was not, by the fact of its being transmitted to the Clearing House for collection, appropriated to the payment of checks certified on the twentieth.

(5) That the relation between the payees of the checks and the bank is controlled by rules of law, and not by any supposed custom, which may affect the members of the Clearing House, but to which such payees are strangers.

The order appealed from, therefore, in so far as it directed the receiver to pay over the moneys, should be reversed, and in other respects affirmed, with costs.

FOLLETT, J., concurred.

Van Brunt, P. J.:

Under the principles declared in the decision of the case of *The People* v. *St. Nicholas Bank, In re Kurzman* (76 Hun, 522), decided at the last term of this court, I am unable to perceive how the receiver has any standing in this court as an appellant. In that case it was decided that the receiver was not a trustee for the creditors, but was the mere hand of the court to execute the directions and obey the orders given to him by the court. The receiver, therefore, representing nobody but the court, when directed by an order of the court to do a certain thing, is certainly not aggrieved by such an order, and the provisions of section 1294 of the Code, which regulate the right to appeal, are that a party *aggrieved* may appeal, and no authority to appeal is given to anybody else. In the case at bar, however, notwithstanding this position, an appeal is entertained upon the part of a receiver, representing, as above stated, nobody but the court — in fact, the hand appealing against the directions of the brain. It is apparent that if the receiver, the hand, had not taken the unwarrantable liberty of disputing the directions of the brain, according to the result of the opinions in this case, over $130,000 would have been misappropriated because of the entertainment by the court of applications for the disposition of property in the receiver's hands in individual cases of a like character to those in which the court held in the case above cited that such direction should be given. If the receiver had obeyed the order he certainly would have been protected by the direction of the court, and thus, it seems to me, we have at once a striking illustration of the evil results almost necessarily attending the entertainment of proceedings of this character on behalf of and against the receiver.

It is urged in respect to the decision in the case cited, that "in referring in that decision to the court, *we* meant not simply the Special Term, or any other branch, but the entire court made up of its various branches, including the General Term," and that "it having been held, therefore, that the receiver, as an officer of the court, has a right to apply to the court for instructions, the discretion which is vested in the Special Term can also be exercised by the General Term upon the receiver taking an appeal."

It is further stated that "in this case it was not the receiver applying to the court for instructions, but depositors who have

brought the receiver into court to obtain a direction that he pay a large sum of money to such claimants out of the moneys in his hands.    Under such circumstances, where the claimants and not the receiver apply for summary relief, and this is granted notwithstanding the opposition of the receiver and the interests which he represents, we fail to see why the receiver is not, within the meaning of section 1294 of the Code, a party aggrieved, and thus having the right to appeal to the General Term."

What difference it can make as to the relations of the receiver to the court, as to who is the cause of the giving of the direction to the receiver, I cannot imagine.    According to this theory, if the receiver asks the court for instructions, he is entitled to them and must act upon them; but if he gets them without asking for them, he may contest them, a conclusion the mere statement of which seems to carry with it its refutation.

It is said that because instructions are opposed by the receiver and the interests he represents, that he is a party aggrieved within the meaning of section 1294 of the Code.

In the case cited the decision was founded upon the assertion that the receiver represented nobody but the court; that he was the mere hand of the court, and, therefore, entitled to directions from the court, a position which shows clearly that the receiver is not a party aggrieved.    A principal (the court) can give his agent (the receiver representing the court only, as held) any instructions it pleases, and the agent cannot be aggrieved.    According to the view advanced in the case at bar, it depends upon whether the instructions suit the receiver's taste or not, whether they shall be obeyed. If he is indifferent or even careless, the receiver is protected by the order, no matter how harmful to the interest of those whom *the court* represents.

But it is said that the receiver is entitled to the instructions of the whole court made up of its various branches, including the General Term, and that when instructions have been given by one branch of the court the direction vested in that branch may also be exercised by another branch, viz., the General Term, upon the receiver taking an appeal.    Whatever may be the powers of the General Term in the cases of original applications made to it, it is

clear that it can review the action taken by the Special Term only in the manner provided by the Code, and that is by an appeal by a party aggrieved. But as a temporary receiver, as was held in the *Kurzman* case, as has been above shown, represents nobody but the court (the court in this instance being represented by the Special Term), he certainly has no grievance against his principal which can possibly bring him within the category of an aggrieved party, and entitled to appeal.

There can be no doubt but that the only proper practice is to have all such questions determined when the persons whose rights may be ultimately affected are before the court, so that they can be heard before such rights are adjudicated upon. Differing as I do with the views of the majority of the court in the case cited, I concur in the result arrived at by Mr. Justice O'BRIEN.

It has been the well-established doctrine for a long period in the history of adjudications in this State that upon a deposit being made by a customer in a bank, in the ordinary course of business, of money, or of drafts or checks received and credited as money, the title to the money, or to the drafts or checks, is immediately vested in and becomes the property of the bank. (*Commercial Bank of Albany* v. *Hughes*, 17 Wend. 94; *Metropolitan Nat. Bank* v. *Lloyd*, 90 N. Y. 530; *Cragie* v. *Hadley*, 99 id. 131.) And this rule was in no respect infringed upon by the decision of the case of *The People* v. *City Bank of Rochester* (96 N. Y. 32) and kindred cases.

In the cases at bar there is attempted to be established a claim that the deposits which were made upon the day that the checks of the petitioners were certified were specially devoted to the meeting of such certified checks. There does not seem to be a particle of evidence to sustain any such proposition, which was the ground upon which the case of *The People* v. *The City Bank of Rochester*, last cited, was decided. In the cases at bar deposits were made generally, and certifications were made generally, the depositors in every instance having balances to their credit at the time the deposits on the day in question were made, in some instances in excess of the checks drawn and certified, and in others such balance not being sufficient (excluding the deposits of the day) to meet such drafts.

The certification of a check by a bank is a statement, upon the part of the bank, that the drawer has sufficient funds to meet it in the bank applicable to its payment, and an agreement on behalf of the bank that these funds will be retained and paid upon the check when it is presented. It may further be said that, as far as the holder of the check was concerned, it is immaterial whether such statements, in respect to the amount of money which the depositor had in the bank, is true or not; there is an obligation upon the part of the bank to pay that check when presented. Therefore, the certification of the check is simply an acceptance by the bank of a draft upon it by which it becomes primarily liable to the holder to pay. Now, such being the undertaking of the bank upon certification of the check, where is there any promise or understanding, or agreement upon the part of the bank, that the money last received shall be appropriated to meeting that obligation? Upon the contrary, applying the ordinary rule in respect to credits, where payments are made upon general account, the bank, in the payment of such an obligation, would be presumed to use the money which had first been deposited, and not that which had been last deposited. This rule has been repeatedly applied in respect to the application of payments, where the Statute of Limitations has arisen, where the question has been as to the payment out of particular moneys, and in kindred cases. (*Clayton's Case,* 1 Mer. 572; *Walden* v. *Davison,* 11 Wend. 65; *Allen* v. *Culver,* 3 Den. 293; *U. S.* v. *Kirkpatrick,* 9 Wheat. 720; *Bixby* v. *Drexel,* 56 How. 478; *Sheppard* v. *Steele,* 43 N. Y. 52.) Therefore, the claim that these certifications were made, based upon the deposits of the day, or were to be deemed as an appropriation of these deposits to the payment of these checks by the bank, seems to have no foundation.

The only ground upon which the petitioners can establish any right to the application of any particular moneys to the meeting of these checks and certifications, is that by the sending of the checks to the Clearing House to be exchanged with the various banks upon which they were drawn, the Clearing House was created a trustee for the purpose of the application of the proceeds of the checks deposited to the payment of the checks certified and drawn.

If this rule is to be adopted, however, it does not limit itself to the checks drawn and certified on the day of this deposit, but

applies to all checks, no matter when drawn nor when certified, which were presented at the Clearing House on the morning of the day subsequent to this deposit; because if any trust was created, it was for the benefit of all who had claims upon the bank, which were presented at the Clearing House on that day. And this suggestion seems to me to show the fallacy of the position that there was any trust created which gave the holders of these certified checks or the checks drawn upon the day when these deposits were made, the right to claim payment out of the proceeds of the checks deposited, which were sent to the Clearing House.

The learned court below placed its decision upon the ground of agency; that the Clearing House was the agent of both parties in respect to the exchanging of the checks in question. But it seems to me that in the case of the mere failure of an agent to do his duty, the party in respect to whom I have directed my agent to do something which he has failed to do does not get any vested right in its performance. The failure of my agent to follow my directions is precisely the same as though I had failed to act myself. Suppose, for example, I had sent my clerk with the money to pay a debt which I owed. He went to the place, but for some reason did not pay the debt and returned, and the sheriff, having an attachment against me, issued at the suit of another creditor, serves it upon my clerk with my money in his possession. Would the first-named creditor have any claim upon that money? Would not the attaching creditor be able to hold it under his attachment? There would be no change of title; it would be in me all the time.

So it was in respect to this failure to carry through the exchanges at the Clearing House on the morning after the deposit. The agent did not do what it was instructed to do. There was no change of title. That remained precisely the same as though this abortive effort to effect the exchange had not been made. From the course of business in the Clearing House it would appear that that institution is a mere exchange where the various banks meet for the purpose of exchanging their obligations and paying their debts; that it is the place of meeting of the various banks to effect their exchanges under the direction of the managers of the Clearing House. And I am unable to see that the Clearing House got any title to or control over the property of any of these banks. The

one bank exchanges obligations with the other, and the debtor bank pays to the creditor bank in cash. And that is all. Where is there anything in such a transaction tending to show that the Clearing House was created a trustee for the purpose of paying obligations of this bank out of the property of the bank? It seems to me that this being the course of business, this property belonged to the St. Nicholas Bank until its agent parted with it in the effecting of the exchanges.

It is a familiar principle that with the inability of a principal to act because of legal incapacity, the right of the agent to act fails. So in the cases at bar, when this bank ceased to do business, whatever uncompleted work its agents had on hand, such agents had no power to finish it, because their power ended with the incapacity of the bank. And this court has no power to complete that which was incomplete, unless some person has acquired a vested right in such completion. This, we have seen, the holders of these checks have not acquired, there being no appropriation of any particular money of the depositor to the meeting of these obligations, and no right acquired to any such application.

I am, therefore, of opinion that the order was ill-advised, and that such applications should not be entertained by the court, since, as has already been shown, they are apt to lead to results disastrous to those who may be finally entitled to the residuum of the wreck.

Order appealed from, in so far as it directed receiver to pay over moneys, reversed, and in other respects affirmed, with costs.